UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER B. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06CV01652 (RWR) |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## MOTION TO DISMISS OR TRANSFER

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendants Central Intelligence Agency

and General Michael V. Hayden, Director of Central Intelligence Agency, by and through their

undersigned counsel, respectfully move to dismiss this action for lack of jurisdiction and failure

to state a claim. In the alternative, defendants request that this Court transfer it to the Eastern

District of Virginia pursuant to 28 U.S.C. §1404(a).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice

Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for CIA and General Michael v. Hayden

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER B.                                    )
                                           )
    Plaintiff,                          )
                                           )
        v.                          )          Civil Action No. 1:06CV01652 (RWR)
                                           )
CENTRAL INTELLIGENCE AGENCY,               )
    et al.,                             )
                                           )
    Defendants.                         )
                                           )
_____        )

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

A former covert contract employee of the Central Intelligence Agency ("CIA") filed this action against the CIA, the Director of Central Intelligence Agency ("DCIA") – General Michael V. Hayden,  a CIA employee – Margaret Peggy Lyons, and ten unnamed defendants, which he claims are either "unknown and/or covert officials at the CIA."  1st Am. Complaint, ¶¶ 4-7.[1] The nine counts raised by plaintiff in his complaint fall into three categories of claims: (1) claims seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, of various personnel actions  (Counts I and IV), (2) due process claims challenging his termination and purported statements made to government contractors regarding his security clearance (Counts II, III, V and IX), and (3) claims alleging violations of the Privacy Act, 5 U.S.C. § 552a (Counts VI -VIII).

In his APA claims, plaintiff alleges that the CIA (1) misclassified him as a contract employee rather than a staff employee (Count I), and (2) violated unspecified statutes and

_____

[1] Neither Ms. Lyons nor any of the Doe defendants have been served with process. Therefore, this motion is filed on behalf of the CIA and the DCIA.

regulations because (a) it did not provide him any reason for the termination other than for the "convenience of the government" or an opportunity to challenge the termination, and (b) it failed to reimburse him for certain expenses and cancelled his health insurance (Count IV). These claims should be dismissed for lack of jurisdiction and failure to state a claim. First, the Civil Service Reform Act ("CSRA") provides the exclusive statutory scheme for reviewing personnel actions. Accordingly, APA claims related to federal employment disputes are precluded by the CSRA. Second, even if such claims were not precluded by the CSRA, they should be dismissed for failure to state a claim. The DCIA has discretion to terminate a person employed by the CIA for any reason and the decision is not subject to review. Nothing in the CIA regulations limits this discretion or grants a CIA employee an enforcement right to seek administrative review of his termination. Third, plaintiff's claim with respect to reimbursement of expenses and cancellation of health insurance should be dismissed because (1) he has not adequately pled these claims and (2) the APA does not authorize monetary damages for such claims.

Plaintiff's due process claims should also be dismissed for failure to state a claim. Plaintiff alleges the CIA violated his Fifth Amendment right to due process because (1) the CIA did not provide a sufficient reason for the termination or an opportunity to challenge the termination (Counts II and III) and (2) the CIA provided inaccurate information to one or more unnamed government contractors when they contacted the CIA to transfer or renew his security clearance and, as a result, the government contractors never provided him with an offer of employment or withdrew the offer (Counts V and IX). Plaintiff had no property or liberty interest in either employment with the CIA or a security clearance. Moreover, plaintiff cannot establish that he has been deprived of any protected liberty interest because he has not alleged

2

that the CIA made any public accusations against him in connection with his termination which damaged his reputation or his termination precluded him from obtain other employment.

Plaintiff's claims under the Privacy Act should also be dismissed. He alleges that the defendants violated the Privacy Act, 5 U.S.C. §§ 552a(e)(2), (e)(5) and (e)(6) by failing to collect information to the greatest extent practicable directly from him, failing to maintain accurate records, and disseminating inaccurate information to unspecified government contractors. The allegations made by plaintiff that the CIA violated subsections (e)(5) and (e)(6) are insufficient to state a claim because he does not identify which records are allegedly inaccurate or to whom and when CIA allegedly disseminated the information. Moreover, to the extent he alleges any inaccuracy in any records, he alleges the records were inaccurate or incomplete because they did not "denote his true employment status with the CIA and the extent to which he possesses a security clearance." 1st Am. Complaint, ¶¶ 75, 88. This assertion, however, ignores the classified nature of his employment with the CIA. The fact that the CIA could not confirm "his true identity" as a CIA employee is not inaccurate information; it is simply a recognition of the classified nature of his employment record as a covert contract employee.

Plaintiff's attempt to state a claim under subsection (e)(2) is also flawed. To state a claim under subsection (e)(2), plaintiff must show that the CIA did not collect information to the greatest extent practicable directly from him and as a result made an adverse determination about him with respect to a right, benefit and privilege under federal programs. If the alleged adverse determination was his termination, the claim is both barred by the statute of limitation and precluded by the CSRA. If the alleged adverse action is not his termination, but a purported determination made regarding his security clearance, he also fails to state a claim for at least two

3

reasons. First, even if a decision to revoke a security clearance could be considered an adverse decision, he does not allege that the CIA ever actually revoked his security clearance. Instead, he claims that the CIA impeded the requests by unnamed government contractors to transfer or renew his security clearance because the CIA's records did not denote his true identity as a former CIA employee. But, as previously explained, that is not an adverse action based on inaccurate information or failure to collect information directly from the plaintiff; it is simply a reflection of the classified nature of his employment. Second, plaintiff's claim is barred by the statute of limitations because his security clearance could only be "reapproved" within two years after his termination. Executive Order No. 12968, § 2.3(d).

Finally, this case should be transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404. Even if the addition of the Privacy Act claims makes venue proper in the District of Columbia, transfer is appropriate because neither the CIA nor the plaintiff reside in the District and none of the events giving rise to plaintiff's claims occurred in the District.

Accordingly, plaintiff's complaint should be dismissed for lack of jurisdiction and failure to state a claim or transferred to the Eastern District of Virginia.

## STATEMENT OF THE CASE

Plaintiff became a covert contract employee of the CIA in the early 1990s. 1st Am. Complaint, ¶ 8. He alleges at some unspecified point in the 1990s, he became a full staff employee of the CIA. Id. ¶ 9. He alleges that during the course of his relationship with the CIA, he incurred approximately $30,000 - $40,000 worth of operational expenses for which he was never reimbursed. Id. ¶ 11. On October 3, 2002, CIA terminated his employment. Id. ¶ 12. The CIA did not provide him an opportunity to seek administrative review of the termination. Id.

¶ 18.  According to plaintiff, the only reason offered for the termination was for the "convenience of the government." Id. ¶¶ 11, 18.  He further alleges that as a result of the termination, he was forced to incur unspecified expenses that exceed $15,000.  Id. ¶ 15.  He also alleges that CIA improperly terminated his CIA sponsored health insurance.  Id. ¶ 16.

He alleges that at the time that he was terminated, he possessed a TOP SECRET and SCI security clearances.  Id. ¶ 20.  He further alleges sometime between 2000 and 2006, he was verbally informed by "representatives of the CIA that there were no security clearance issues or concerns within his CIA file." Id. ¶ 20.  He asserts that "[o]ne or more government contractors attempted to have the CIA transfer or renew [his] security clearance." Id. ¶ 21.  He claims that in response to these requests, the CIA provided the government contractors false and defamatory information.  Id. ¶ 59.  Specifically, he alleges that the information provided by the CIA was inaccurate in that it did not "denote his true employment status with the CIA and the extent to which he possesses a security clearance." Id. ¶ 75, 88.  As a result, he alleges the government contractors never provided him with an offer of employment or withdrew offers that had been provided.  Id. ¶ 21.

## ARGUMENT

I.    **THIS COURT LACKS JURISDICTION OVER PLAINTIFF'S APA CLAIMS CHALLENGING HIS TERMINATION OF EMPLOYMENT AND OTHER ALLEGED PERSONNEL ACTIONS .**

In Counts I and IV of his complaint, plaintiff seeks to challenge various personnel actions taken by the CIA.  Specifically, he alleges that CIA erroneously classified him as a contract

employee (rather than a staff employee),[2] improperly terminated his employment, failed to

reimburse him for $30,000-40,000 worth of operational expenses, failed to reimburse him for

$15,000 other expenses, and cancelled his health benefits. 1st Am. Complaint, ¶¶ 22-62.

The CSRA provides the exclusive remedy for such personnel disputes. Courts have held

that because the CSRA is a comprehensive remedial scheme for the review of personnel

decisions, federal employees are prohibited from challenging such decisions outside of the

CSRA. United States v. Fausto, 484 U.S. 439, 448 (1988) (civil service employee in category

explicitly exempted from the administrative and judicial review of personnel actions under the

CSRA could not pursue statutory remedies that would otherwise be available); Bush v. Lucas,

462 U.S. 367, 388 (1983) (federal employee may not pursue constitutional claim arising from

---

[2] In his complaint, plaintiff asserts that he has been classified by the CIA "as some sort of independent contractor." 1st Am. Complaint, ¶ 10. This assertion is apparently based on plaintiff's assumption that a "contract employee" is an "independent contractor." However, under CIA's regulations, a "contract employee" is defined as a individual "employed in a non-career status through a contract."  Exhibit 3 ¶ 72(c) to Declaration of Linda Dove ("Dove Decl."). They are "appointed under the authority of the [DCI] to serve in an employment relationship entitling them to benefits provided under federal law or regulations except as modified by laws applicable to the Agency." Id. ¶ 72(d).  An "independent contractor," on the other hand is a self-employed individual who is hired for a specific temporary purpose and receives no benefits from the contracting agency. See generally Black's Law Dictionary 785 (8th ed. 2004). Plaintiff's allegation that he received government health benefits is consistent with the allegation that he was a CIA employee and not an independent contractor. See 1st Am. Complaint, ¶ 16. But, even if plaintiff were an independent contractor, this Court would still lack jurisdiction of these claims. The Contract Dispute Act ("CDA"), 4 U.S.C. §§ 601-613, like the CSRA, provides a comprehensive statutory scheme of legal and administrative remedies for resolving government contract claims, including contracts for the procurement of services, 41 U.S.C. § 602(a). The Court of Claims, not the district court, has jurisdiction to hear claims arising under the CDA, 28 U.S.C. §§ 1346, 1491. See Janicki Logging Co. v. Mateer, 42 F.3d 561, 564-65 (9th Cir. 1994). See also Teel v. DiLeonardi, No. 98c2568, 1999 WL 133997 (N.D. Ill. March 5, 1999) (if plaintiff was an employee of the United States Marshal Service, his claim was precluded by the CSRA; if he is an independent contractor, his claim is precluded by the CDA).

6

alleged demotion because CSRA was comprehensive procedural and substantive provision for remedy); see Steadman v. Governor, U.S. Soldiers' and Airmen's Home, 918 F.2d 963, 967 (D.C. Cir. 1990) (CSRA is part of an "enormously complicated and subtle scheme" governing federal employee relations and "federal employees may not circumvent that structure even if their claim is based as well on the Constitution").

Congress has elected to exclude CIA employees from the protections of the CSRA for personnel actions that would be otherwise covered by the Act. 5 U.S.C. §§ 2302(a)(2)(C)(ii). The Supreme Court and this Circuit have held that such an exclusion both precludes employees from using the CSRA as a basis to challenge personnel actions and prohibits excluded employees from pursuing judicial remedies they would have otherwise had in the absence of the CSRA. Fausto, 484 U.S. at 447; Amer. Postal Workers Union AFL-CIO v. U.S. Postal Serv., 940 F.2d 704, 709 (D.C. Cir. 1991) ("The Supreme Court and several of our sister circuits have held that the exclusion of a class of employees from the protections of the CSRA does not leave these employees 'free to pursue whatever judicial remedies [they] would have had before enactment of the CSRA.'") (quoting Fausto, 484 U.S. at 447). The CSRA's deliberate exclusion of particular categories of employees from its remedial provisions "is not an uninformative consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action of the type governed by [the CSRA]." Fausto, 448 U.S. at 448-49; see Kleiman v. Dep't of Energy, 956 F.2d 335, 338 (D.C. Cir. 1992).

"Personnel actions" under the CSRA include "appointment," "reassignment," "termination or other disciplinary action, and "a decision concerning pay, benefits, or awards. . . ." 5 U.S.C. §

7

2302(2)(A). The CSRA also precludes claims that in taking a particular personnel action, an agency violated its own regulations. Graham v. Ashcroft, 358 F.3d 931, 935-36 (D.C. Cir. 2004). The APA claims raised by plaintiff in Counts I and IV fall with this prohibition because they seek judicial review of CIA's decisions regarding his termination and the denial of his claims for benefits. The D.C. Circuit has concluded that CSRA precludes judicial review of personnel actions under the APA. Harrison v. Bowen, 815 F.2d 1505, 1513 (D.C. Cir. 1987); Carducci v. Regan, 714 F.2d 171, 174 (D.C. Cir. 1983).

Accordingly, plaintiff's challenges to his termination and other personnel actions in Counts I and IV should be dismissed for lack of jurisdiction.

## II.     PLAINTIFF'S APA CLAIMS IN COUNTS I AND IV SHOULD BE DISMISSED THEY FAIL TO STATE A CLAIM FOR RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT.

Even if plaintiff's APA claims (Counts I and IV) regarding adverse personnel actions were not precluded by the CSRA, they should be dismissed for failure to state a claim. The Court does not need to reach the issue presented in Count I — whether he is a "contract employee" or a "staff employee" — because the CIA did not violate any statutes or regulations in either case. Regardless of whether he is a contract employee or staff employee, the CIA has the discretion to terminate his employment for any reason and he does not have any enforceable right to seek administrative review of the decision. Moreover, plaintiff's claim that CIA violated statutes or regulations by failing to reimburse him for unspecified expenses or denying other benefits should be dismissed because he has not adequately pled these claims and the APA does not authorize monetary damages for such alleged violations.

8

A.    **CIA Did Not Violate Any Statutes or Regulations in Terminating Plaintiff's Covert Employment Relationship.**

Plaintiff's claim that his termination violated unspecified regulations and statues is predicated on the assumptions that (1) the stated reason for the separation — "convenience of the government" is insufficient as a matter of law and (2) that he has a legal right to seek administrative review of the decision to terminate his employment. Neither assumption is supported by the law.

The National Security Act of 1947, 50 U.S.C. § 403-4(g), provides that "the Director may, in the Director's discretion, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director shall deem such termination necessary and advisable in the interests of the United States." The United States Supreme Court found that "under [5 U.S.C.] § 701(a)(2), even when Congress has not affirmatively precluded judicial oversight, 'review is not be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of its discretion.'" Webster v. Doe, 486 U.S. 592, 600 (1988) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)). The Court found that this provision of the National Security Act forecloses "the application of any meaningful judicial standard of review." Id. The Court, therefore, held that the decision to terminate the employment of an individual is "committed to agency discretion by law" and thus is not subject to judicial review under the APA. Id. (quoting 5 U.S.C. § 701(a)(2)). Thus, whether plaintiff was a staff employee or a contract employee, CIA has unreviewable discretion to terminate employment for any reason, including the "convenience of the government."

Plaintiff also has no legal support for his purported right to seek administrative review of

9

the termination decision. While CIA's internal regulations set forth a procedure for administrative review for decisions to terminate employment by the Personnel Employment Board ("PEB"), the regulations do not establish an enforceable legal right to such review. The regulations specifically provide that "the PEB ordinarily will not be convened for separation of contract employees." Exhibit 2 ¶ 8e(1) to Dove Decl. Moreover, the regulations on their face explicitly state that

> Nothing in this or any other Agency regulation or policy statement should be construed to create or confer on any person or entity any right to administrative or judicial review of Agency employment termination procedures, their implementation or decisions or actions rendered there under. Neither this nor any other Agency regulation or policy statement creates or confers any right, benefit, or privilege, whether substantive or procedural, for continued Agency employment. Finally, neither this nor any other Agency regulation or policy statement creates or confers any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency, any Agency instrumentality or any Agency officer or employee, or any other person acting for or on behalf of the Agency.

Id. ¶ 8h.[3] The regulation establishing PEB procedures contain a similar caveat. It states that this regulation does not "entitle an employee to any due process or in any way limit or detract from the authority of the [DCIA] to discipline an employee or terminate an individual's Agency employment, with or without the procedures set forth in this regulation . . . or elsewhere." Exhibit 1 ¶ 5f to Dove Decl.,.

Thus, whether he was a staff employee or a contract employee, the CIA regulations do not

---

[3] They also provide that "[p]ursuant to statutory authority, any employee may be terminated from the Agency at any time without regard to any procedural steps set forth in this regulation or elsewhere when the [DCIA], in his discretion, deems it necessary or advisable in the interests of the United States." Id. ¶ 8f (emphasis added).

establish an enforceable right with respect to the termination of employment. Indeed, the D.C.

Court of Appeals recognized this very point in Doe v. Casey, 796 F.2d 1508, 1520 (D.C. Cir.

1990), aff'd in part and reversed in other parts, Webster v. Doe, 486 U.S. 592 (1988). In that

case, as here, plaintiff contended that the CIA violated its own regulations regarding

terminations. The court rejected this claim, finding that the CIA regulations "provides no

independent source of procedural or substantive protections" with regard to termination of

employment. Id. at 1520. Accordingly, plaintiff fails to state a claim under the APA that the

CIA's termination of his employment violated any statute or regulation.

### B.    Plaintiff Fails To State A Claim Under The APA With Respect to Reimbursement of Expenses or Cancellation of Health Insurance.

Plaintiff also fails to state an APA claim with respect to reimbursement and cancellation

of his health benefits for at least two reasons. First, plaintiff has failed to adequately plead these

claims. For example, while he alleges that CIA's failure to reimburse him for unspecified

expenses and its termination of his health insurance "violated CIA regulations and/or statutes"

(1st Am. Complaint, ¶¶ 50- 52), he has provided not factual or legal basis for his claim. Because

plaintiff has failed to identify or provide other factual details regarding these claims, defendants

are precluded from exploring potential arguments and defenses. Consequently, plaintiff has

failed to satisfy even the relatively low threshold of notice pleading. See Bergen v. Rothschild,

648 F. Supp. 582, 586 (D.D.C. 1986) ("The complaint must contain sufficient information for the

court to determine whether or not a valid claim for relief has been stated and to enable the

opposing party to prepare an adequate pleading").

Second, he cannot seek damages for an APA claim. See 5 U.S.C. § 702; Hubbard v.

Adminstrator, E.P.A., 982 F.2d 531, 533 (D.C. Cir. 1992).  "To sustain a claim that the

Government is liable for awards of monetary damages, the waiver of sovereign immunity must

extend unambiguously to such monetary claims."  Lane v. Pena, 518 U.S. 187, 192 (1996).  No

language in the APA unambiguously extends the government's waiver of sovereign immunity to

money damages.  To the contrary, the APA permits a plaintiff to bring an "action in a court of the

United States seeking relief other than money damages.  5 U.S.C. § 702 (emphasis added).  See

M.K. v. Tenet, 99 F. Supp. 2d 12, 24-25 (D.D.C. 2000) (dismissing plaintiff's claims for

monetary relief for APA claims).

    Accordingly, plaintiff's claim for relief for these claims should be dismissed.

## III.    PLAINTIFF'S DUE PROCESS CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NO PROTECTED PROPERTY OR LIBERTY INTEREST.

    In his complaint, plaintiff raises four Fifth Amendment due process claims.  See 1st Am.

Complaint, Counts II, III, V, IX.  Two of the claims (Counts II and III) focus solely on

circumstances surrounding the termination of his employment.  In Count II, he alleges that the

CIA violated his due process rights as a federal employee because (1) the only reason given for

his termination was "convenience of the government" and (2) he was denied the ability to

challenge the termination before a Personnel Evaluation Board.  1st Am. Complaint, ¶¶ 32-34.

Similarly, in Count III, he alleges that he was denied due process as a contractor because the CIA

does not have absolute discretion to terminate contractors without either good cause or an

opportunity for a hearing. Id. ¶¶ 41.

    Plaintiff's other two due process claims (Counts V and IX) relate to purported information

provided by the CIA to government contractors when they requested to "transfer" or "renew" his

security clearance. In Count V, he claims that he was entitled to a name clearing hearing because the CIA had intentionally interfered with his efforts to obtain employment with government contractors by impeding the transfer of his security clearance or by implying derogatory information existed that precluded the granting of a security clearance. Id. ¶ 59-61. In Count IX, he makes similar allegations. He claims that he was deprived of a liberty interest without due process because the CIA allegedly disseminated false information regarding his security clearance to government contractors. Id. ¶109-110. He alleges that this dissemination of false information "has the same impact as actually denying or revoking his security clearance." Id. ¶ 111.

To state a Fifth Amendment due process claim, plaintiff must show that he was deprived of a protected property or liberty interest. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569-70 (1972); Paul v. Davis, 424 U.S. 693 (1976); MK v. Tenet, 99 F. Supp. 2d 12, 26 (D.D.C. 2000). Plaintiff has not made such a showing with regard to any of his claims.

## A.    Plaintiff Has Not Been Deprived Of Any Property Interest.

Plaintiff does not even assert that he has been deprived of any property interest. Indeed, he cannot. It is well-established that there is no constitutionally protected property interest in a job with the CIA. Doe v. Gates, 981 F.2d 1316, 1321 (D.C. Cir. 1993). In Doe v. Gates, the D.C. Circuit found the National Security Act of 1947, 50 U.S.C. § 403-4(g), provides the DCIA the unreviewable discretion to terminate the employment of any employee and that the regulations and policies of the CIA do not contradict this broad statutory grant. 981 F.2d at 1320. As the court explained, "[t]he law is clear that if the statute relegates termination decisions to the discretion of the Director, no property entitlement exists." Id. Accord Dickson v. United States,

831 F. Supp. 893 (D. D.C. 1993) (plaintiff has no protected property interest in employment at the CIA).

He also has no protected property interest in a security clearance. Department of Navy v. Egan, 484 U.S. 518, 528 (1998) ("no one has a 'right' to a security clearance"). Accord Hill v. Dep't of Air Force, 844 F.2d 1407, 1411 (10th Cir. 1998); Stehney v. Perry, 101 F.3d 925, 936 (3d Cir. 1996); Jones v. Dep't of Navy, 978 F.2d 1223, 1225-26 (Fed. Cir. 1992); Dorfmont v. Brown, 913 F.2d 1399, 1403-04 (9th Cir. 1990); Jamil v. Sec'y of Dep't. of Defense, 910 F.2d 1203 (4th Cir. 1990); Doe v. Cheney, 885 F.2d 898, 909-10 (D.C. Cir. 1989).

Thus, plaintiff cannot state a due process violation based on a property interest either with respect to his termination or the purported tacit denial or revocation of his security clearance.

**B.      Plaintiff Has Not Been Deprived Of A Protected Liberty Interest.**

Plaintiff also cannot establish that he has been deprived of any protected liberty interest. To establish a deprivation of a liberty interest in the employment context, a plaintiff must first show that the government negatively altered his employment status. Lyons v. Sullivan, 602 F.2d 7, 11 (1st Cir. 1979) (affirming dismissal of plaintiff's claim for deprivation of liberty interest where he resigned his position). Accord O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir. 1998); Mosrie v. Barry, 718 F.2d 1151, 1161 (D.C. Cir. 1983). A plaintiff must then show that in altering his employment status, the defendant also

> stigmatizes the employee or impugns his reputation so as to either (1) seriously damage his standing and associations in his community ("reputation-plus'"), or (2) foreclose his freedom to take advantage of other employment opportunities by either (a) automatically excluding him from a definite range of employment opportunities with the government or (b) broadly precluding him from continuing his chosen career ("'stigma or disability").

14

M.K. v. Tenet, 196 F. Supp. 2d 8, 15 (D.D.C. 2001).  Accord Bd. of Regents v. Roth, 408 U.S.
at 573; Paul v. Davis, 424 U.S. at 710-711.

      While Peter B. can show a change in employment status, namely termination of
employment, he cannot meet the other criteria necessary to establish a liberty interest with
respect to his termination.  To fit within the "reputation plus" prong, a plaintiff must demonstrate
not only that the agency negatively altered his employment status, but also that the agency made
"public accusations that will damage [the plaintiff's] standing and association in the community,"
in connection with the change in employment status.  MK v. Tenet, 196 F. Supp. 2d at 15
(quoting Doe v. Cheney, 885 F.2d 898, 910 (D.C. Cir. 1999) (emphasis added)).  Accord
O'Donnell, 148 F.3d at 1140; Orange v. District of Columbia, 59 F.3d 1267, 1274 (D.C. Cir.
1995) (concluding firing without any associated public statement is not actionable); M.K v.
Tenet, 196 F. Supp. 2d at 15 (dismissing due process of former CIA employee when there was no
public accusations).  In this case, while plaintiff makes a general reference to the alleged
"dissemination of false and defamatory impressions" about him, he does not allege that the CIA
made any public accusations about him in connection with the termination.[4]  Indeed, since he
alleges that he was a covert employee (1st Am. Complaint, ¶ 3), there is no basis for alleging that
CIA made such statements.  Moreover, even if there were public statements regarding his

_____

    [4] Plaintiff alleges that "the CIA, through the actions of the DCI, Margaret Peggy Lyons
and/or Does #1-#10, unlawfully and/or unethically caused Peter B.'s relationship with the CIA to
be terminated" by purportedly "disseminating false and defamatory impressions about Peter B.
throughout certain divisions of the CIA that effectively stigmatized him." 1st Am.Complaint,
¶ 63.  He cannot rely on this allegation to create a liberty interest because it essentially challenges
the basis for his termination.  In any case, this allegation does not form a basis for a liberty
interest because he does not allege that they were communicated to the public. Cf. Doe v.
Cheney, 885 F.2d at 910 (disclosure to other agencies does not infringe on liberty interest).

termination, plaintiff has not demonstrated that they impugned the plaintiff's moral character or reputation. Bd. of Regents v. Roth, 408 U.S. at 573; Zaky v. U.S. Veterans Admin., 793 F.2d 832, 840 (7th Cir. 1986). As the court in MK v. Tenet explicitly found, "the termination of employment" does not "sufficiently damage a plaintiff's reputation" so as to create a property interest. 196 F. Supp. 2d at 15. That is especially true here where the ground for the termination is "convenience of the government." 1st Am. Complaint, ¶ 12. Plaintiff also cannot make a claim under the "stigma or disability" prong with regard to the termination of his employment with the CIA. When CIA terminates the employment of an individual, it does not preclude him from seeking other government jobs for which he is qualified. 50 U.S.C. § 403-4(g).

Unable to show any liberty interest with respect to his termination, plaintiff then tries to hinge his due process claim on purported statements made later by the CIA to government contractors when they requested to transfer or renew his security clearance. These statements did not relate to his termination. Instead, he alleges that the information provided was inaccurate because it did not "denote his true employment status with the CIA and the extent to which he possesses a security clearance." 1st Am. Complaint, ¶¶ 75, 88. Plaintiff's reliance on this new allegation to establish a liberty interest, however, is fundamentally flawed in several ways.

First, for a defamation to give rise to procedural due process, it is necessary that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay. Paul v. Davis, 424 U.S. 693, 711-12 (1976); Mosrie v. Barry, 718 F.2d 1151, 1161-62 (D.C. Cir. 1983). Here, the purported statements regarding his security clearance were not made in connection with his termination or any other change in his status. Rather, they were made in connection with his subsequent applications for employment with government

16

contractors. Courts have held that where, as here, the alleged stigmatizing statements are not made in connection with either a discharge or demotion, an individual is not entitled to a "name-clearing" hearing under the due process clause. O'Donnell v. Barry, 148 F.3d 1126 (D.C. Cir. 1998); Mosrie v. Barry, 718 F.2d 1151 (D.C. Cir. 1983); Lyons v. Sullivan, 602 F.2d 7, 11 (1st Cir. 1979). See also Siegert v. Gilley, 500 U.S. 226, 233-34 (1991) (Even if statements by a former government employer "would undoubtedly damage the reputation of one in [plaintiff's] position, and impair his future employment prospects," they do not provide the basis for a due process claim if they are not "made in the context of the employer discharging or failing to rehire a plaintiff.")

For example, in O'Donnell v. Barry, 148 F.3d at 1140, a retired police officer sued the District, mayor and chief of police alleging that he had been deprived of due process by defamatory statements made by the chief of police in 1996. As here, the plaintiff in that case alleged that the statements made by the chief of police criticizing his performance "irreparably stigmatized" him and harmed his chances for future employment. Id. The court rejected his due process claim because the alleged defamation did not occur in the course of a demotion or discharge. Id. While the plaintiff tried to link the defamation to an alleged demotion, which occurred one year earlier, the court found that there was "no obvious link, temporal or logical" between the transfer to another department and the public criticism. As the court explained, the conceptual basis for reputation-plus "rests on the fact that official criticism will carry much more weight if the person criticized is at the same time demoted or fired." Id.

The same is true here. The purported statements made by the CIA to government contractors cannot possibly relate to his termination since he complains that CIA did not reveal

17

his "true identity as a CIA employee." 1st Am. Complaint, ¶¶ 75. If CIA did not reveal his

identify as a former employee, it could not have possibly discussed the reasons or circumstances

surrounding his termination.

Plaintiff tries to avoid this defect by arguing that his "status" was changed by the

purported statements because they had the effect of denying or revoking his security clearance.

1st Am. Complaint, ¶ 113. This assertion, however, ignores the classified nature of his

employment with the CIA. As he admits, he was a covert employee of the CIA 1st Am.

Complaint, ¶ 3. Moreover, as plaintiff's counsel acknowledged in the declaration supporting

plaintiff's motion for leave to file the complaint under the name "Peter B.," rather than his real

name, "the relationship that [plaintiff] formerly maintained with the CIA remains classified."

Declaration of Mark S. Zaid (Zaid Decl.), ¶ 4. [5] Thus, the fact that the CIA could not confirm

"his true identity as a CIA employee or the extent to which he possesses security clearances" is

not a change in status. It is simply a reflection of the classified nature of his employment

relationship with the CIA. See, e.g., Miller v. Casey, 730 F.2d 773, 777-78 (D. C. Cir. 1984) (it

is an acceptable response for an agency not to confirm or deny when the answer would disclose

classified information).[6]

Second, even if the CIA had made statements suggesting that his security clearance had

---

[5] Plaintiff's counsel further acknowledged that "disclosure of the true identity of the plaintiff is prohibited by law" and "[t]o release his true identity and address may jeopardize the plaintiff's physical well-being given the work that he performed and his ability to secure future employment in highly sensitive positions, as well as possibly cause harm to the national security interest." Zaid Decl. ¶ 5.

[6] This response is known as a Glomar response. The name is derived from Phillippi v. CIA, 546 F.2d 1009, 1101 (D.C. Cir. 1976), in which the CIA successfully defended its refusal to confirm or deny the existence of records regarding a ship, the Hughes Glomar Explorer.

been denied or revoked, plaintiff could not establish a liberty interest because such alleged statement do not impugned the plaintiffs' moral character or reputation. Bd. of Regents v. Roth, 408 U.S. at 573; Zaky v. U.S. Veterans Admin., 793 F.2d 832, 840 (7th Cir. 1986). As the Supreme Court explained in Department of Navy v. Egan, 484 U.S. at 528, "a clearance does not equate with passing judgment upon an individual's character. Instead, it is only an attempt to predict his possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information." See Jamil v. Sec'y of Defense, 910 F.2d at 1209 ("because of the inherently discretionary judgment required in the decisionmaking process, 'no one has a "right" to a security clearance,' and revocation does not constitute an adjudication of one's character"); Jones v. Dep't of Navy, 978 F.2d at 1226 ("loss [of security clearance] did not reflect upon their characters"); MK v. Tenet, 196 F. Supp. 2d at 15.. Therefore, plaintiff cannot meet the "reputation-plus" criterion.

Third, plaintiff cannot make a claim under the "stigma or disability" prong. Even if the plaintiff's speculation were true with respect to employment in the area of national security, plaintiff's claims ignore that an individual has no right to employment in the national security arena or to a security clearance. Egan, 484 U.S. at 528; Doe v. Cheney, 885 F.2d at 909-10. In Dorfmont, 913 F.2d at 1403, the court rejected plaintiff's claim that revocation of her security clearance deprived her of her ability to practice her chosen profession, since without it she could no longer obtain employment with a defense contractor. The court found that "[t]he ability to pursue such employment stands on precisely the same footing as the security clearance itself. If there is no protected interest in a security clearance, there is no liberty interest in employment requiring such clearance." Id. Therefore, even if a plaintiff was precluded from obtaining

19

employment in the area of national security, he has not been deprived of a liberty interest.

Finally, even if plaintiff had been deprived of a liberty interest and thus entitled to a a name-clearing hearing, that would not provide a legal basis for the actual relief that he seeks – "to rescind [CIA's] termination." 1st Am. Complaint, Prayer for Relief. As the D.C. Circuit explained, plaintiff's liberty interest "implicates his post-employment reputation rather than any right to continued employment" with the agency. Doe v. Department of Justice, 753 F.2d 1092, 1102 (D.C. Cir. 1985). Accord Boston v. Webb, 783 F.2d 1163, 1167 (4th Cir. 1986) ("The interest was not to remain employed unless cause could be shown – a property interest – but was merely to 'clear his name' against unfounded charges"); Dennis v. S.& S Consolidated Rural High School Dist., 577 F.2d 338, 344 (5th Cir. 1978) (the purpose of a fairness hearing is "not to afford an opportunity to recapture his previous employment but simply to 'clear his name'").

In short, no matter how plaintiff tries to frame his alleged due process interest, he cannot state a claim. Plaintiff did not have any procedural due process rights either as a contract or staff employee with regard to his termination. Nor has he stated a due process claim based on the purported statements made to government contractors. Accordingly, plaintiff's due process claims in Counts II, III, V and IX of the Amended Complaint should be dismissed.

## IV.    PLAINTIFF'S CLAIMS UNDER THE PRIVACY ACT SHOULD BE DISMISSED.

In Counts VI -VIII of his complaint, plaintiff also claims that the CIA violated the Privacy Act by failing to collect information to the greatest extent practicable directly from him, 5 U.S.C. § 552a(e)(6), by failing to maintain accurate records, id. § 552a(e)(5), and by disseminating inaccurate information to unspecified government contractors, id. § 552a(e)(6). Based on these

20

claims, he seeks damages under 5 U.S.C. § 552a(g)(1)(C).[7]  As explained below, plaintiff fails to state a claim for relief on any of these claims.[8]

### A.    Plaintiff's Claims That CIA Violated 5 U.S.C. §§ 552a(e)(5) and (e)(6) Should Be Dismissed.

Subsection (e)(5) provides that an agency maintain records  "which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."  To state a claim under that provision, plaintiff must, therefore, demonstrate that (1) he has been aggrieved by an adverse determination, (2) the CIA failed to maintain his records with the degree of accuracy necessary to assure fairness in that determination, (3) that CIA's reliance on the inaccurate records was the proximate cause of the determination, and (4) the CIA acted willfully and intentionally in failing to maintain accurate records. See Deters v. United States Parole Comm'n, 85 F.3d 655, 657 (D.C. Cir. 1996).

Subsection (e)(6) provides that an agency must  "prior to disseminating any record about an individual to any person other than an agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely and relevant for agency purposes."  5 U.S.C. § 552a(e)(6).

---

[7]  In his complaint, plaintiff only cites 5 U.S.C. 552a(g)(1)(C) for the alleged violation of § 552a(e)(2). 1st Am. Complaint, ¶ 77.  Plaintiff, however, alleges that the has suffered damages for the other violations. Id. ¶¶ 92, 104.

[8] Plaintiffs also asks the Court "to refer those CIA officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1)." 1st Am. Complaint, Prayer for Relief. That provision, however, simply provides for criminal penalties; it does not create a private right of action for a plaintiff to request such relief.  Unt v. Aerospace Corp., 765 F.2d 1440, 1448 (9th Cir. 1985).  Moreover, this Court "has no authority to require an order that a criminal action be instituted." Berson v. I.C.C., 625 F. Supp. 10, 12 (D. Mass 1984).  Thus, plaintiff cannot state a claim for such relief.

Thus, to state a claim under this provision, plaintiff must show that (1) the agency disclosed records about him to another person other than an agency, (2) the CIA failed to make reasonable efforts to assure that the records are accurate, complete, timely and relevant for agency purposes, (3) he was aggrieved by an adverse determination, (4) the inaccurate information provided by the CIA was the proximate cause of an adverse determination, and (5) the CIA acted willfully and intentionally in failing to assure accurate records were disclosed. Logan v. Dep't of Veterans Affairs, 357 F. Supp.2d 149, 154 (D.D.C. 2004).

In this case, plaintiff simply alleges that in response to inquiries from unspecified government contractors to transfer or renew his security clearance the CIA "implied derogatory information existed that would preclude the granting of a security clearance." 1st Am. Complaint, ¶ 86. He does not identify which records are allegedly inaccurate or to whom and when CIA allegedly disseminated information. Such vague claims are insufficient to state a claim for violation of subsection(e)(5) and (6).[9] A complaint "must at least include some factual assertions to put [the government ] on notice of 'the event being sued upon.'" Flowers v. The Exec. Office of the President, 142 F. Supp. 2d 38, 46-47 (D.D.C. 2001) (quoting 5 Charles A. Wright & Arthur Miller, Federal Practice & Procedure § 1202 at 6707 (1990)). See also Kowal v. MCI Communication Corp, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("standards for pleading information and belief must be construed with the purpose of [Fed. R. Civ. P.] 9(b), which attempts in part to prevent the filing of a complaint as a pretext for discovery of unknown wrongs"). Without knowing what records are alleged inaccurate, what the alleged inaccuracies

---

[9] Plaintiff's failure to adequately allege that CIA's acted willfully and intentionally is addressed infra at 27.

are, and when and to whom the records were distributed, defendants have no way of investigating plaintiff's allegations and analyzing possible defenses.

To the extent any alleged inaccuracy in any records is identified, he appears to be claiming that the records are inaccurate because they fail "to denote his true employment status with the CIA and the extent to which he possesses a security clearance." 1st Am. Complaint, ¶ 88. But, as previously explained, this assertion ignores the classified nature of his employment with the CIA. Thus, the fact that CIA could not confirm "his true identity" as a CIA covert employee or the extent to which he possessed security clearances does not mean that CIA provided "inaccurate information." It is simply a recognition of the classified nature of his employment relationship with the CIA. See supra at 18. The failure of CIA to confirm his identity as a CIA cannot be used to establish a Privacy Act claim under 5 U.S.C. §§ 552a(e)(5) and (e)(6).

Accordingly, plaintiff's claims in Counts VII and VIII should be dismissed for failure to state a claim.

**B.    Plaintiff's Claim That CIA Violated 5 U.S.C. § 552a(e)(2) Should Be Dismissed.**

Plaintiff's claim that the CIA violated 5 U.S.C. § 552a(e)(2) by failing to collect information directly from him should also be dismissed. 1st Am. Complaint, ¶¶ 69-80. Subsection (e)(2) states that in maintaining records an agency shall "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determination about an individual right, benefit and privilege under Federal Programs." 5 U.S.C. § 552a(e)(2). Thus, in order to show a violation of this provision, plaintiff

must show that (1) the agency did not collect information to the greatest extent practicable directly from him, (2) as a result, it made an adverse determination about him with respect to a right, benefit and privilege under Federal Programs, and (3) the violation was "intentional and wilfulful." Walter v. Thornburgh, 888 F.2d 870, 972 (D.C. Cir. 1989), abrogated on other grounds by Doe v. Chao, 540 U.S. 614 (2004).

Like his claims with respect to subsections (e)(5) and (e)(6), plaintiff has not adequately pled this claim. He does not identify what information was allegedly not collected from him directly or how this purported information is inaccurate. It is also not clear what adverse determination was made about him with respect to any right, benefit and privilege under federal programs.[10]

If he is alleging that the adverse action was his separation from the agency, this claim should be dismissed for at least two additional reasons. First, it is barred by the statute of limitations. The Privacy Act provides that an action to enforce its terms must be brought "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). To the extent the records at issue are the records upon which the agency based its decision to terminate his employment, plaintiff's claim is not timely because his employment was terminated on October 3, 2002 (1st Am. Complaint, ¶ 12), more than four years before he filed the complaint in this Court on October 17, 2006. Accordingly, any Privacy Act claim based on the termination of his employment is barred by the statute of limitations.

Second, plaintiff is not permitted to bring claims under the Privacy Act that would

---

[10] Plaintiff also fails to allege sufficient facts to show that any action by CIA was willful or intentional. See infra at 27.

effectively circumvent the statutory scheme that Congress enacted to preclude review of the CIA's personnel decisions. As previously explained, challenges to federal personnel decisions are governed by the CSRA. See supra at 5-8. Courts have "refused to allow 'the exhaustive remedial scheme of the CSRA' to be 'impermissibly frustrated,' Carducci v. Regan, 714 F.2d 171, 174 (D.C. Cir. 1983), by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA." Kieman v. Dep't of Energy, 956 F.2d, 335, 338 (D.C. Cir. 1992). See also Pellerin v. Veterans Admin., 790 F.2d 1553, 1555 (11th Cir. 1986) )(Privacy Act "may not be employed as a skeleton key for reopening consideration of unfavorable federal agency decisions"); Houlihan v. OPM, 909 F.2d 383, 384-85 (9th Cir. 1990) (Privacy Act does not provide "back door" review of personnel decisions).

If plaintiff is not challenging the termination, but a purported determination made with respect to his security clearance, plaintiff also cannot state a valid claim for relief. First, even if a decision denying or revoking a security clearance could be considered an adverse action for purposes of 5 U.S.C. § 552a(e)(2), he does not allege that the CIA ever actually revoked his security clearance. Nor does he allege that the CIA ever denied an application for a security clearance. Instead, he claims that unnamed government contractors contacted the CIA to request that his security clearance be transferred or renewed, and the CIA impeded the transfer or renewal of his security clearance because the CIA's records did not "denote his true employment status with the CIA and the extent to which he possesses a security clearance." 1st Am. Complaint, ¶ 75. This claim, however, again ignores the classified nature of his employment with the CIA. See supra at 18. The claim that CIA did not confirm his covert employment or the

extent to which he possessed a security clearance is not an adverse action based an inaccurate information. It is simply a reflection of the classified nature of his employment.

Second, even if his employment with the CIA were not classified, this claim should be dismissed because it is barred by the statute of limitations. It is based on the assumption that the CIA had authority to transfer or renew his security clearance. While he possessed a security clearance when he was employed by the CIA, that security clearance lapsed as matter of law when his employment was terminated with the CIA. See Executive Order No. 12968, § 2.1(b)(4) ("access to classified information shall be terminated when an employee no longer has need for access"). "Access eligibility" can be "reapproved for individuals who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years and who have been retired or otherwise separated from United States Government employment for not more than two years; provided there is no indication that the individual may no longer satisfy the standards of this order, the individual certifies in writing that there has been no change in the relevant information provided by individual for the last background investigation, and an appropriate record check reveals no unfavorable information." Id. § 3.3(d) (emphasis added). In this case, plaintiff's security clearance lapsed on October 3, 2002, when his employment with the CIA was terminated. Accordingly, even if he had submitted a formal request (which he does not allege that he did) for his access eligibility to be "reapproved," the request would have to be made within two years after the date of his termination or by October 3, 2004. Plaintiff, however, did not assert his Privacy Act claim until January 12, 2007, when he filed his Amended Complaint. Thus, to the extent plaintiff is basing his claim on a purported decision by CIA not to reapprove his security clearance, it is barred by the statute of limitations.

Accordingly, no matter how plaintiff tries to frame his claim, he cannot state a claim for violation of subsection (e)(2) of the Privacy Act.

### C.    Plaintiff Fails to State a Claim for Damages.

Even if plaintiff could state a claim that CIA violated subsections (e)(2), (e)(5) and (e)(6), he fails to state a claim for damages for those violations.  To establish a claim for damages under the Privacy Act, Plaintiff must also show that the agency acted in an "intentional or willful" manner.  See 5 U.S.C. § 552a(g)(4).  The D.C. Circuit has made it clear that the violation must be so "'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.'"  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (quoting Wisdom v. Dep't of Hous. & Urban Dev., 713 F.2d 422, 425 (8th Cir. 1983)).  Other than general allegations, which constitute nothing more than recitation of the language in the Privacy Act.  1st Am. Complaint, ¶¶ 78, 90, 102, plaintiff has not identified what CIA conduct is allegedly intentional and/or willful, nor does anything in the First Amended Complaint suggest the kind of conduct that rises to the level of an intentional or willful Privacy Act violation.  This lack of factual allegations justifies dismissal of the damages claims.  See White v. OPM, 840 F.2d 85, 87-89 (D.C. Cir. 1988) (affirming dismissal where Privacy Act complaint did not allege factual basis to support allegations of willful and intentional conduct on the part of the agency); Perry v. Block, 684 F.2d 121, 129 (D.C. Cir. 1982) (affirming dismissal of Privacy Act claim where no willful conduct was alleged)

Plaintiff's claims under the Privacy Act should, therefore, be dismissed.

27

**V.    THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF VIRGINIA PURSUANT TO 28 U.S.C. § 1404.**

The CIA filed a motion to dismiss or transfer plaintiff's initial complaint pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406. Venue was not proper in the District of Columbia under 28 U.S.C. § 1391(e) because plaintiff does not reside in the District, the defendant agency does not reside in the District, and plaintiff does not allege that the events giving arise to his claims occurred in the District. In response to that motion, plaintiff amended his complaint to add three claims under the Privacy Act. Under the Privacy Act, claims may be brought "in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia." 5 U.S.C. § 552a(g)(5).

Even if the addition of the Privacy Act claims makes venue proper in the District of Columbia of his other claims under the doctrine of pendent venue, transfer to the Eastern District of Virginia is still appropriate under 28 U.S.C. § 1404(a). Under that section, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have be brought." 28 U.S.C. § 1404(a). In evaluating whether a transfer is convenient and in the interest of justice, courts have considered the following factors:

> (1) the plaintiff's choice of forum, unless the balance of the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the case of access to sources of proof.

McClamrock v. Ely Lilly & Co., 267 F. Supp.2d 33, 37 (D.D.C. 2003) (quoting Trout Unlimited

v. U.S. Dept. Of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996).

Analysis of these factors shows that it is overall in the interest of the parties to transfer to the Eastern District of Virginia. As explained above, plaintiff does not reside in the District of Columbia. Nor does plaintiff allege that any of the events giving arise to plaintiff's claims occurred in the District of Columbia.[11] Thus, the District of Columbia has no meaningful tie to the controversy. Whereas courts usually give deference to plaintiff's choice of forum, deference to plaintiff's choice of forum "is lessened when plaintiff's forum choice lacks meaningful ties to the controversy and [has] no particular interest in the parties or the subject matter." Southern Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 86 (D.D.C. 2004) (internal quotation marks and citation omitted). Accord Brannen v. Nat'l R.R. Passenger Corp., 403 F. Supp. 2d 89, 93 (D.D.C. 2005); Devaughn v. Inphonic, Inc., 403 F. Supp. 2d 68, 72 (D.D.C. 2005); Kotan v. Pizza Outlet, Inc., 400 F. Supp. 2d 44, 49 (D.D.C. 2005); McClamrock v. Eli Lily & Co., 267 F. Supp. 2d at 36.

Accordingly, this action should be transferred to the Eastern District of Virginia where the defendant CIA resides and where it would appear from the complaint that the actions giving rise to plaintiff's complaint occurred.

---

[11] In the amended complaint, plaintiff asserts that "[u]pon information and belief, Peter B.'s situation, included congressional interaction and publicized legal actions that have been initiated on his behalf or that of his family, have led to the inclusion of the DCIA in office at the time to be briefed on relevant matters and became involved in the decision-making process to determine how best the CIA should react." 1st Am. Complaint, ¶ 14. That allegation, however, does not suggest that the events which formed the basis for claims occurred in the District. Instead, it only speculates that subsequent plans on how to react to Congressional inquiries or legal actions regarding the underlying claims occurred in the District.

29

## CONCLUSION

For the above stated reasons, this Court should grant defendant's motion to dismiss or transfer it to the Eastern District of Virginia.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for CIA and General Michael V. Hayden

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

PETER B.                                )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        Civil Action No.
                                        )        06-1652 (RWR)
CENTRAL INTELLIGENCE AGENCY             )
and GENERAL MICHAEL HAYDEN,             )
                                        )
                    Defendants.         )
_____ )

### DECLARATION OF LINDA DOVE,
### INFORMATION REVIEW OFFICER, DIRECTORATE OF SUPPORT
### CENTRAL INTELLIGENCE AGENCY

I, LINDA DOVE, hereby declare and say:

1.  I am the Information Review Officer (IRO) for the
Directorate of Support (DS) of the Central Intelligence
Agency (CIA).  I have held this position since July 2005.
Immediately prior to my current assignment, I was Chief of
the Freedom of Information Act (FOIA) Branch, from October
2003, and prior to that I served as Associate IRO for the
Director of Central Intelligence and for the Directorate of
Support.  I served as a FOIA case manager prior to my work
as Associate IRO, and before that I held various positions
within the Directorate of Intelligence (DI) since the start
of my career within the CIA in 1987.

2.  The DS provides the CIA with a foundation of
mission-critical services, including the protection of CIA

personnel, information, facilities, technology, communications, logistics, training, financial management, medical services, human resources, records management and declassification, and information technology.  The CIA's personnel and payroll functions reside organizationally in the Directorate of Support.

3.  As DS/IRO, I am responsible for overseeing the public release of personnel-related internal CIA regulations for which the DS is responsible.  As IRO for the DS, I am authorized to sign declarations on behalf of the DS regarding publicly released CIA regulations, and the contents of any publicly released regulations under the cognizance of the DS.

4.  Through the exercise of my official duties, I am familiar with this civil action.  I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

5.  Attached hereto as Exhibit 1 is a true and accurate copy of the CIA's internal regulation governing the Personnel Evaluation Board, dated and effective 7 August 2002 through 13 October 2005, redacted to remove protected CIA information, none of which is related to the above-captioned matter.

2

6.    Attached hereto as Exhibit 2 is a true and accurate copy of the CIA's internal regulation governing Termination of Employment, dated and effective 7 August 2002 through 7 April 2005, redacted to remove protected CIA information, none of which is related to the above-captioned matter.

7.    Attached hereto as Exhibit 3 is a true and accurate copy of the CIA's internal regulation governing Contract Employees, dated and effective 19 February 2002 through 7 April 2005, redacted to remove protected CIA information, none of which is related to the above-captioned matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of March, 2007.


Linda Dove
Information Review Officer
Directorate of Support
Central Intelligence Agency

3

UNCLASSIFIED

**Date:** 08/07/2002 (Regulations may contain various dates)

**Category:** ███ - Conduct; Accountability and Discipline          **OPR:** ███

**Title:** AR ███ (U) PERSONNEL EVALUATION BOARD

████████████████████████████████████

---

> **SUMMARY: 7 August 2002 (0705)**
>
> AR ███ is added to the Agency regulatory system to establish the Personnel Evaluation Board (PEB) as the primary mechanism for reviewing employee suitability and security cases that may result in the imposition of serious discipline, termination of employment, or revocation of security clearances; and the regulation is placed under a new regulatory series entitled 'Conduct, Accountability, and Discipline'. Certain information formerly contained in HR ███ and HR ███ have been incorporated into this new regulation.
>
> HR ███ and HR ███ is hereby rescinded.
>
> *Because this regulation is new, boldfaced text has not been used.*

*This regulation was written by the EXDIR's office in coordination with OGC, HR, and OS. Questions regarding this regulation may be addressed to OS/SAS on secure* ███

## 5. (U) PERSONNEL EVALUATION BOARD

**SYNOPSIS.** This regulation establishes the Personnel Evaluation Board (PEB) as the primary mechanism for reviewing employee suitability and security cases that may result in the imposition of serious discipline, termination of employment, or revocation of security clearances. The PEB shall have purview over both trial-period employees and employees who have been certified out of trial period. The PEB shall review cases in which information surfaced during Office of Security (OS), Inspector General (IG), or other investigations, or otherwise coming to the attention of Agency management presents cause for concern regarding an employee's performance, conduct, or suitability; advise the Chief Human Resources Officer on the suitability of employees for continued employment with the Agency; advise the Director of Security (D/OS) on cases raising security concerns; provide recommendations to management for disciplinary actions; and assist management upon request in determining the

acceptability of employees for overseas and other sensitive assignments or certification out of trial period. The PEB also serves on request as an advisory council in the areas of employee discipline, suitability, performance, standards of conduct, and the handling and administration of problem or difficult employees.

a. **POLICY**

(1) The national security missions, functions, and activities of the Agency are of such importance and sensitivity that any concerns pertaining to an employee's performance, conduct and/or suitability for continued Agency employment must be considered carefully and resolved fully whenever they arise. It is Agency policy to seek to resolve such issues in a manner that is both helpful and supportive to employees, while at the same time protective of the Agency's equities, which are paramount. The PEB serves as a central point of review of pertinent information to assist Agency management to achieve these ends. The PEB also ensures that security, human resource, medical, legal, counterintelligence, and management considerations are taken into account.

b. **ORGANIZATION.** The Chief, Office of Security/Personnel Security Group (C/PSG), or designee, shall chair the PEB. The voting members of the PEB include the following individuals or their designees: CHRO; Director of Medical Services (D/OMS); Director of Security (D/OS); Chief of the Counterintelligence Center (C/CIC); and the Head of the Employee's Career Service or career subgroup. In addition, the IG, the General Counsel (GC), the Director of Equal Employment Opportunity (D/EEO), or their designees, as well as a representative from the employee's home directorate or mission support office shall serve as nonvoting advisors to the PEB to ensure the accuracy, fairness, and effectiveness of the process. The PEB may invite representatives from other Agency components (for example, the employee's office of assignment) to assist the PEB in its deliberations. The Office of Security, Special Activities Staff (OS/SAS) shall serve as Executive Secretary to the PEB and provide it with staff support. The board shall meet on the call of C/SAS.

c. **RESPONSIBILITIES AND PROCEDURES**

(1) Any manager or supervisor who discovers or develops information that raises significant security concerns about any Agency employee, doubts about the suitability of any Agency employee for continued employment by the Agency, or identifies performance or conduct deficiencies of such severity that they may warrant imposition of serious discipline, as described in AR      should refer the matter to SAS. Cases may also be referred to SAS by any Head of Career Service or Operating Official who desires senior review of possible courses of action in such cases or the interpretation/development of Agency policy in this area.

(2) A request to convene the PEB may be made by the OS, OMS, OIG, CIC, or by the head of the employee's home office or the office to which the employee has been assigned. The referring component shall, as appropriate, coordinate the referral with the Employee's Career Service.

(3) In making a request for the PEB, the referring component shall, in writing, provide a detailed statement describing the basis for convening the board. The referring

component shall also advise SAS whether the component believes there is a need to remove the employee from the workplace pending Agency action and, if so, shall provide the basis for that belief. In those cases where a request is made that the employee be removed from the workplace pending adjudication of the case, a decision will be made by D/OS or designee as to whether the employee should be placed on administrative leave, to include enforced annual leave, or be placed in a suspension without pay status. D/OS or designee may also choose to suspend an employee's security clearance and/or access approval(s) in connection with the removal of the employee from the workplace.

(4) Once a case is referred to SAS, the Agency component of assignment of the employee who is the subject of the PEB shall, on a timely basis, submit to the PEB via SAS all pertinent information and documentation available to the component. Upon request by SAS, HR (including OMS), OS, CIC, OEEO, IG, and any other components having information pertinent to a case are also responsible for bringing the information to the attention of the PEB via SAS.

(5) The employee who is the subject of the PEB request shall be notified in writing at least five business days prior to the convening of the PEB. The notification shall advise the employee that the PEB is being convened to make recommendations concerning possible administrative actions. If the employee is not available after reasonable efforts to locate the employee have been made or if there are security or counterintelligence reasons not to inform the employee about the convening of the PEB, the employee need not be notified.

(6) The employee shall be informed in writing of all the issues that are expected to be discussed concerning the employee at the PEB. SAS may omit a particular issue from the statement if D/OS or designee determines there are security or counterintelligence reasons not to inform the employee of the particular issue. D/OS or designee shall coordinate with C/CIC as appropriate regarding counterintelligence issues. The PEB may consider other issues that arise during discussions even though they were not brought to the attention of the employee prior to the convening of the panel.

(7) A representative from SAS shall meet with the employee prior to the convening of the PEB except if a decision has been made not to notify the employee of the PEB, if there are other security reasons not to meet with the employee, or if the employee is assigned overseas or outside of the Headquarters area, or is otherwise unavailable. Where personal meetings are not possible, SAS shall seek to communicate with the employee via secure telephone or cable.

(8) At the pre-PEB meeting, SAS shall advise the employee that he/she has up to five business days from the date of receipt of the written notification to comment in writing on the issues being brought before the board. SAS shall notify the employee that the panel will be convened without information from the employee if the employee does not provide a written statement within the prescribed period. Classified comments must be prepared in a secure facility acceptable to D/OS or designee. Employees who have been removed from access to Agency facilities must prepare classified comments, if they have

any, at a secure facility designated by D/OS or designee.

(9) All written comments received by SAS shall be provided or made available to the PEB members in advance of the meeting to permit their review and consideration. Neither the employee who is the subject of the PEB meeting nor the employee's personal representative may attend the PEB meeting.

(10) The PEB shall analyze and evaluate the information and make recommendations to D/OS or designee in cases raising security concerns or to Chief Human Resources Officer in cases raising solely suitability or performance concerns. The PEB has the authority to recommend the full range of disciplinary actions as described in AR █████ as well as other corrective measures such as reassigning the employee to another position. The PEB may also recommend revocation of security clearances. It is the PEB's responsibility in each case to assess any adverse actions it proposes in terms of both the possible risk to national security and the employee's past contributions and potential future value to the Agency. As appropriate, the PEB shall recommend risk management plans to minimize the risk to classified information and Agency personnel and programs that may be the result of any adverse action.

(11) PEB members shall strive to reach consensus in making their recommendations to management. In those instances where a consensus of PEB members is not reached, the differing positions shall be recorded to assist the appropriate senior official, as identified in paragraph 10 above, in making a determination with respect to imposition of discipline, employment termination, security revocation, and/or other action regarding the employee.

(12) After each panel meeting, SAS shall prepare a statement of facts and pertinent issues with the panel's conclusions, reasons, and recommendations. If, for non-security reasons, the panel recommends disciplinary action, up to and including termination of employment, SAS shall forward the document to Chief Human Resources Officer for decision. In deciding a case, Chief Human Resources Officer shall coordinate with the Head of the Employee's Career Service. With the concurrence of the Head of the Employee's Career Service, Chief Human Resources Officer may choose to take action other than that recommended by the PEB. In those rare instances where there are compelling time pressures, a verbal approval may be obtained from Chief Human Resources Officer and the Head of the Career Service to proceed with agreed upon action(s).

(13) PEB recommendations for disciplinary action based on security concerns or on mixed suitability and security concerns shall be forwarded by SAS to D/OS or designee for decision. In making the disciplinary decision, D/OS or designee shall coordinate with the Head of the Employee's Career Service. If the PEB recommends revocation of security clearances, the recommendation shall be forwarded to DD/OS for decision[1]. Whenever DD/OS decides to revoke an employee's access to classified information, it is not necessary to obtain the approval or concurrence of CHRO, the Head of the Employee's Career Service, or any other Agency official for the revocation to become effective. DD/OS may revoke or suspend an employee's access to classified information

regardless of the recommendations from the PEB.

[1]DD/OS is the revoking authority. D/OS serves as an appeal authority pursuant to the provisions of AR ██████

(14)  In PEB cases requiring coordination, the Head of the Employee's Career Service shall implement the decisions made by Chief Human Resources Officer or D/OS or designee with which he/she concurs. The Heads of the Employee's Career Service shall notify SAS in a timely manner via memorandum when recommended actions have been implemented or provide explanations for not implementing recommendations. For decisions with which the Head of the Employee's Career Service does not concur, the Head of Career Service shall within five business days advise Chief Human Resources Officer or D/OS or designee, as appropriate, of his/her non-concurrence and propose an alternative. If all parties agree on the alternative proposal, that proposal shall be implemented. If Chief Human Resources Officer or D/OS or designee continues to support the original decision, he or she may request that the PEB be reconvened or may forward the original decision and the career-service alternative proposal to the Executive Director (EXDIR) for a final decision.

(15)  Once a final decision has been made, a representative of SAS shall meet or otherwise confer with the employee and provide the employee with a written statement of the decision, including a statement that sets forth the reasons for the decision, in accordance with the notice requirements of AR ██████  The employee shall also be advised of his/her appeal rights and provided the opportunity to acknowledge the statement. For cases involving revocation of the employee's access to classified information, the statement and other associated material shall conform to the requirements of AR ██████

(16)  It is the responsibility of SAS to follow up on the decisions made by responsible officials regarding PEB cases to ensure that these decisions are carried out. In some cases, SAS is responsible for implementing the decisions, while in other cases SAS will monitor implementation carried out by others.

(17)  Deliberations of the PEB are considered to be privileged and confidential, and all notes, memoranda, and/or minutes of these deliberations will be maintained solely by SAS. No dissemination of PEB deliberative material will be made outside of the PEB or SAS except on a strict need-to-know basis.

d.  **APPEAL PROCEDURES.** The rights of employees to appeal PEB decisions are set forth in this regulation and depend on the severity of the discipline being imposed. Descriptions of "lesser disciplinary action" and "serious disciplinary action" are set forth in AR ██████

(1)  There is no appeal for lesser disciplinary actions, for example, those actions that result in an oral admonition, letter of warning, letter of reprimand (with or without caveats), or suspension of five days or less.

(2)  Serious disciplinary action—such as suspension for more than five days, reduction in grade, or termination of employment where termination is for reasons other than

revocation of security clearances—generally may be appealed to the EXDIR. SAS shall advise the employee that he/she has five business days from the date of receipt of the notification of the disciplinary decision to submit written comments to SAS. In cases where the employee requests access to Agency regulations or other relevant materials, the employee shall have five business days from receipt of the requested materials or notice that the materials will not be provided to submit written comments to SAS. SAS shall make the employee's written comments available to the EXDIR and notify the employee in writing of the EXDIR's decision.

(3) Where employment is being terminated because of revocation of access to classified information, the procedures for an employee to appeal the revocation decision shall be those set forth in AR ████.

(4) The EXDIR's decision shall be final with respect to all disciplinary actions except termination of employment. In cases involving termination of employment for reasons other than revocation of access to classified information, employees may appeal to the Director of Central Intelligence (DCI) if the EXDIR denies the initial appeal. The employee shall have five business days from receipt of the EXDIR's decision to submit written comments through SAS to the DCI. The employee must prepare any classified written comments to the EXDIR or to the DCI at a secure facility designated by D/OS or designee. Upon receipt of an appeal, the DCI will decide, in his discretion, whether to terminate the individual's Agency employment pursuant to the DCI's statutory authority to do so. SAS shall notify the employee in writing of the DCI's decision.

(5) Notwithstanding the provisions of any other Agency regulation or policy statement, including the Agency's expedited Privacy Act procedures for employees, employees who have been removed from access to Agency facilities (for example, employees who have been placed on administrative leave or who have had their access to classified information suspended or revoked) will be provided access to Agency regulations for preparation of their statements to the PEB, or appeals to the EXDIR or DCI, only to the extent that C/SAS determines the regulations are relevant to the employee's case and to the extent that access would not be inconsistent with national security. No employee has a right to review any CIA file or record in connection with preparation of a statement to the PEB, or an appeal to the EXDIR or DCI. Any request for access to Agency files in connection with a PEB case will be provided to C/SAS for decision. The decision of C/SAS shall be final and not subject to appeal. Employees and their representatives may review classified information only in a secure facility designated by D/OS or designee. The review shall be conducted during normal business hours at a time and under circumstances determined by D/OS or designee.

(6) Employees may choose to employ private counsel at their own expense and in compliance with the requirements set forth in AR ████████. Private counsel must receive a security clearance, access approval, or security approval as determined appropriate by C/SAS and sign appropriate non-disclosure agreements prior to being provided access to classified information. Private counsel shall not be entitled to receive any more information than C/SAS determines may be provided to the employee and may

be prohibited from obtaining access to information that has been provided to the employee when C/SAS determines such access would be inconsistent with the national security.

**e.  OVERSEAS CANDIDATE REVIEW BOARD (OCRB)**

(1)  The OCRB is the PEB subpanel that is chaired by C/SAS and has the same membership as the PEB.  The OCRB's function is to review proposed overseas assignments involving questions as to the suitability of the employee under consideration for such assignments or their dependents and to make recommendations to the home components of such employees.

(2)  Cases may be referred to the OCRB by the components involved in the employee's assignment, by the employee's career service, or by OS, OIG, CIC, OMS or HR.

(3)  A component that chooses not to accept the recommendations of the OCRB must advise SAS in writing of its reasons for nonacceptance.

**f.  NO ADDITIONAL RIGHTS CONFERRED.**  This regulation does not create for any Agency employee any property or other interest or privilege in Agency employment.  Nor does this regulation entitle an employee to any due process rights or in any way limit or detract from the authority of the Director of Central Intelligence to discipline an employee or terminate an individual's Agency employment, with or without the procedures set forth in this regulation, AR ▮▮▮ or elsewhere.

/s/

George J. Tenet
Director of Central Intelligence

UNCLASSIFIED

**Date:** 08/07/2002

**Category:** ████ Conduct; Accountability and Discipline          **OPR:** ████

**Title:** AR ████ (U) TERMINATION OF EMPLOYMENT

---

> **SUMMARY:** 7 August 2002 (0709)
>
> AR ████ is added to the regulatory system to set forth circumstances under which Agency employment may be terminated; and the regulation is placed under a new regulatory series entitled, Conduct, Accountability, and Discipline. Information formerly contained in AR ████ has been incorporated into this new regulation.
>
> AR ████ is hereby rescinded.
>
> *Because this regulation is new, boldfaced text has not been used.*

*This regulation was written by the EXDIR's office in coordination with OGC, HR, and OS. Questions regarding this regulation may be addressed to OS/SAS on* ████

## 8. TERMINATION OF EMPLOYMENT

**SYNOPSIS. This regulation sets forth circumstances under which Agency employment may be terminated and provides for the manner in which such employment terminations may be effected.**

a. **AUTHORITY AND POLICY.** All employment terminations, other than by mandatory or involuntary retirement under the Central Intelligence Agency Retirement Act of 1964 for Certain Employees, as amended (50 U.S.C. Sec. 2001 *et seq.*), shall be pursuant to the Director of Central Intelligence's (DCI's) statutory authority, including section 104(g) of the National Security Act of 1947, as amended (50 U.S.C. Sec. 403-4(g)), which states that:

"Notwithstanding the provisions of any other law, the Director [of Central Intelligence] may, in the Director's discretion, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director shall deem such termination necessary or advisable in the interests of the United States. Any such termination shall not affect the right

of the officer or employee terminated to seek or accept employment in any other department or agency of the Government if declared eligible for such employment by the Office of Personnel Management."

By the terms of this statute, to terminate the employment of an Agency officer or employee the Director of Central Intelligence (DCI) need only deem employment termination necessary or advisable in the interests of the United States. It is not required that an employment termination under this statute be in the interests of the national security, but only that the DCI, in his discretion, must deem such termination to be in the interests of the United States. Notwithstanding any provisions of this regulation or any other regulation, document, or law, the DCI need not provide to anyone the reasons for such termination if he decides not to do so. Any decision not to provide the reasons for employment termination is entirely discretionary, and a national security basis for such a decision is not required. However, under the terms of this statute, the decision of the DCI to terminate the employment of an Agency employee, regardless of the reasons for such termination, does not foreclose the employee from other employment with the Federal Government. Employment may be terminated by the DCI or by an official of the Agency to whom the DCI delegates appropriate authority. No redelegations of this authority shall be made by officials to whom this authority has been delegated except to Agency personnel lawfully designated to act in the capacity of such officials in their absence. Any reference in this regulation to the DCI shall be deemed to include Agency officials to whom appropriate authority has been delegated.

b. **TERMINATION AUTHORITIES.** The termination authority of the DCI is delegated to:

(1) The Deputy Director of Central Intelligence (DDCI) upon the recommendation of an advisory board.

(2) The Chief Human Resources Officer with respect to any employee who is:

    (a) Recommended by the PEB for termination for suitability reasons such as misconduct or substandard performance. (see AR ▓▓▓▓▓

    (b) Found to have abandoned his or her position;

    (c) Judged to be legally incompetent; or,

    (d) Serving under a Reserve Employee appointment (see AR ▓▓▓▓▓

(3) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(4) The official who executed the contract on behalf of the Agency with respect to contract employees.

(5) The EXDIR is delegated the authority to decide the first-level appeals of employees recommended for termination and to terminate the employment of such employees upon recommendation of an advisory board. The EXDIR also has authority to terminate the employment of an employee who has been declared to be excess to the needs of the service.

(6) The EXDIR, as Chairman of the Panel established under AR███████ to review security decisions to revoke employees' access to classified information, is delegated authority to terminate employment of any employee whose security revocation has been upheld by the Panel.

(7) The Deputy Director of the Office of Security (DD/OS) is delegated authority to terminate the employment of any employee who chooses not to appeal or request a review of a security revocation decision.

**c.  TENURE.** Agency employees do not have tenure and their employment may be terminated pursuant to the terms of the National Security Act of 1947, as amended, without regard to the procedural requirements of this regulation or any other provisions of law. Except as provided by this regulation and AR███████ the termination of an Agency employee is not subject to appeal under the provisions of any regulation, document, or law. Notice is hereby given that nothing in this regulation or in any other regulation, document, or law shall be construed as creating for any employee any property or other interests or privileges in his or her employment.

**d.  CIRCUMSTANCES FOR TERMINATION OF EMPLOYMENT**

(1) **TERMINATION FOR FAILURE TO COMPLETE TRIAL PERIOD SATISFACTORILY.** Any employee determined to be unsuitable for Agency employment during the trial period may be terminated from the Agency. (See AR ███████)

(2) **TERMINATION PRIOR TO EXPIRATION OF CONTRACT.** For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination. However, nothing in the contract shall be construed to prevent the D/OS or designee from suspending or revoking a contract employee's access to classified information at any time.

(3) **TERMINATION FOR FAILURE TO MEET THE WORK AND EFFICIENCY REQUIREMENTS OF THE AGENCY.** Any employee who fails to meet Career Service work and efficiency requirements or to perform assigned duties adequately may be terminated from the Career Service and the Agency.

(4) **TERMINATION FOR FAILURE TO MEET SECURITY STANDARDS.** Any employee who fails to meet the Agency's security standards may be terminated from the Agency. Any determination that an employee fails to meet security standards may be appealed only pursuant to the provisions of AR███████

(5) **TERMINATION FOR FAILURE TO MEET MEDICAL STANDARDS.** Any employee who fails to meet the Agency's medical standards may be terminated from the Agency.

(6) **TERMINATION FOR FAILURE TO MEET AGENCY STANDARDS OF CONDUCT.** The Agency standards of employee conduct are set forth in AR███████ Standards of Conduct; AR███████Conflict of Interest, Lack of Impartiality, etc. An

employee may have his or her employment terminated for failure to meet these standards.

(7) **TERMINATION FOR ABANDONMENT OF POSITION.** Any employee who fails to report for scheduled duty for more than ten consecutive work days without being on approved leave may be terminated from employment for abandonment of position.

(8) **TERMINATION UPON DETERMINATION OF LEGAL INCOMPETENCE.** An employee who is declared by a court of competent jurisdiction to be mentally incompetent may be terminated from employment.

(9) **TERMINATION OF EXCESS PERSONNEL.** An employee who is found to be excess to the needs of the Agency may be terminated from employment. An employee may be determined to be excess to the needs of the Agency if the employee has been declared excess by his or her Career Service and a job search within the Agency is unsuccessful or is not requested by the employee. The grounds for declaring an employee excess to Career Service needs are:

    (a) The Career Service is over strength overall or in a particular grade or functional element.

    (b) There is no longer a requirement in the Career Service for the particular skills or qualifications possessed by the employee.

    (c) There is a reduction or elimination of the functions of the Career Service, thereby requiring a reduction in staff.

(10) **TERMINATION PRIOR TO NOT-TO-EXCEED DATE OF RESERVE APPOINTMENT.** A Reserve Employee may be terminated from employment prior to the not-to-exceed date of his or her appointment if the employee's services are no longer needed, the employee's performance has been inadequate, the employee is not suitable for continued Agency employment, the employee's security clearance has been revoked, or termination of employment otherwise is deemed to be necessary or advisable in the interests of the United States.

(11) **TERMINATION IN OTHER CIRCUMSTANCES.** In addition to the circumstances specified in paragraphs (1) through (10) above, an employee may have his or her employment be terminated whenever the DCI, in his discretion, deems such termination necessary or advisable in the interests of the United States.

e. **PROCEDURES FOR TERMINATION OF EMPLOYMENT.** Except as noted in paragraphs (e)(1) – (e)(6) and paragraph (f) below, terminations pursuant to this regulation shall be carried out in accordance with the procedures set forth in AR ████ and AR ████ Notwithstanding any other provision of this regulation, all termination recommendations shall be routed through the Office of General Counsel (OGC).

(1) **PROCEDURES FOR TERMINATION PRIOR TO EXPIRATION OF CONTRACT.** For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern

termination. The contract may be terminated by the official who executed the contract on behalf of the Agency. However, nothing in the contract shall be construed to prevent D/OS or designee from suspending or revoking a contract employee's access to classified information at any time. The PEB ordinarily will not be convened for separation of contract employees.

(2) **PROCEDURES FOR TERMINATION FOR ABANDONMENT OF POSITION.** If an employee fails to report for duty or to return from leave, an effort will be made to determine the employee's intentions. If the employee's intentions cannot be determined within 10 business days or if it appears that the employee intentionally abandoned his or her position, Chief Human Resources Officer may terminate the employee from the Agency for abandonment of position. The termination will be effective at close of business on the last day of active duty or of approved leave, whichever is later. The PEB ordinarily will not be convened for separation of employees who have abandoned their positions. Unless security considerations dictate otherwise, the Special Activities Staff, Office of Security (SAS) will mail notice of termination to the employee's last known address. If security conditions preclude notice by mail, other reasonable efforts to notify the employee will be undertaken. If subsequent evidence indicates that the abandonment was not the employee's fault, the employee will be reinstated by Chief Human Resources Officer and paid appropriately as if the termination had not occurred.

(3) **PROCEDURES FOR TERMINATION FOR LEGAL INCOMPETENCE.** Upon a judgment by a court of competent jurisdiction that an employee is legally incompetent, Chief Human Resources Officer may terminate the employee from the Agency unless the employee is determined to be eligible for disability retirement. When a decision is made to terminate employment due to legal incompetence, SAS will notify the employee's legal guardian in writing about the action to be taken. The PEB ordinarily will not be convened for separation of employees who have been declared legally incompetent.

(4) **PROCEDURE FOR TERMINATION OF EXCESS PERSONNEL**

    (a) In considering whether an employee is excess to the needs of a Career Service, the Head of the Employee's Career Service will take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth. In any case involving an employee with a disability who is unable to perform essential job functions with or without reasonable accommodation, the decision to declare the employee excess to the needs of the service must be in accordance with the provisions of AR █████

    (b) If the head of a component determines that an employee is excess to the needs of the component, both the Head of the Career Service and the employee will be advised in writing. If the employee wishes, the Career Service will make an effort to arrange placement in another component within that Career Service. If such efforts fail, the Career Service will declare the employee excess to the needs of the Career Service and will notify the employee, Chief Human Resources Officer, and D/OS, via SAS.

UNCLASSIFIED

(c) A representative from SAS will then meet with the employee and determine if the employee wishes placement elsewhere in the Agency at the same or different grade. If the employee wishes placement elsewhere in the Agency, SAS will broker an Agency-wide placement effort. If the employee does not wish placement elsewhere in the Agency or if placement efforts are unsuccessful after a sufficient interval of time, SAS shall so notify Chief Human Resoursces Officer in writing. Chief Human Resoursces Officer shall then forward a recommendation to separate the employee to the EXDIR for decision. The PEB ordinarily will not be convened for separation of employees who have been determined to be excess to the needs of the service.



(6) **PROCEDURES FOR TERMINATION OF RESERVE EMPLOYMENT PRIOR TO NOT-TO-EXCEED DATE OF THE RESERVE APPOINTMENT.** The employment of a Reserve Employee may be terminated by Chief Human Resoursces Officer at any time prior to the not-to-exceed date of the employee's appointment if Chief Human Resoursces Officer determines that the employee's services are no longer needed, the employee's performance has been inadequate, the employee is unsuitable for continued Agency employment, the employee's security clearance has been revoked, or Chief Human Resoursces Officer determines termination is otherwise deemed necessary or advisable in the interests of the United States. Before making such a determination, Chief Human Resoursces Officer shall follow the procedures set forth in AR ███ and AR ███ except that the decision of Chief Human Resoursces Officer is final and not appealable by the employee.

**f.  TERMINATION WITHOUT PROCEDURES.** Pursuant to statutory authority, any employee may be terminated from the Agency at any time without regard to any procedural steps set forth in this regulation or elsewhere when the DCI, in his discretion, deems it necessary or advisable in the interests of the United States. The decision by the DCI to exercise this authority is entirely discretionary. The DCI need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required. The existence or the exercise of this discretionary authority by the DCI is:

(1) Not constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law.

(2) In abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law.

UNCLASSIFIED

g. **APPEAL OF TERMINATION DECISION**

   (1)  Contract employees, reserve employees, ▮▮▮▮▮▮▮▮▮▮ have no right of appeal.

   (2)  When employment is being terminated because of revocation of access to classified information, the procedures for all employees to appeal the revocation decision shall be those set forth in AR▮▮▮▮▮▮.

   (3)  In all other cases, the termination decision may be appealed to the EXDIR. SAS shall advise the employee that he/she has five business days from the date of receipt of the notification of the termination decision to submit written comments to SAS. In cases where the employee requests access to Agency regulations or other relevant materials, the employee shall have five business days from receipt of the requested materials or notice that the materials will not be provided to submit written comments to SAS. SAS shall make the employee's written comments available to the EXDIR and notify the employee in writing of the EXDIR's decision. In cases where the EXDIR is the terminating authority, for example in cases where an employee is declared excess to the needs of the service, the employee may appeal directly to the DCI.

   (4)  Employees may appeal to the DCI in cases where the EXDIR denies the initial appeal or where the EXDIR serves as the terminating authority. The employee shall have five business days from receipt of the EXDIR's decision to submit written comments through SAS to the DCI. The employee must prepare any classified written comments to the EXDIR or to the DCI at a secure facility designated by D/OS or designee. Upon receipt of an appeal, the DCI will decide, in his discretion, whether to terminate the individual's Agency employment pursuant to the DCI's statutory authority to do so. SAS shall notify the employee in writing of the DCI's decision.

h. **NO ADDITIONAL RIGHTS CONFERRED.** Nothing in this or any other Agency regulation or policy statement should be construed to create or confer on any person or entity any right to administrative or judicial review of Agency employment termination procedures, their implementation, or decisions or actions rendered there under. Neither this nor any other Agency regulation or policy statement creates or confers any right, benefit, or privilege, whether substantive or procedural, for continued Agency employment. Finally, neither this nor any other Agency regulation or policy statement creates or confers any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency, any Agency instrumentality, or any Agency officer or employee, or any other person acting for or on behalf of the Agency.

i. **OPPORTUNITY TO RESIGN: RESIGNATION IN LIEU OF TERMINATION**

   (1)  An employee may proffer a resignation at any time before the meeting of an advisory board, as described in AR▮▮▮▮, or if no advisory board meets, at any time before the decision of an appropriate official to separate the employee. In such circumstances, the separation will be recorded as a voluntary resignation unless the DCI, DDCI, EXDIR, D/OS, Chief Human Resources Officer or, ▮▮▮▮▮▮▮▮▮▮▮▮▮ declines

to accept the resignation. If a decision is made not to accept a resignation, the DCI, DDCI, EXDIR, D/OS, Chief Human Resoursces Officer ▓▓▓ as appropriate for the category of employee, may terminate the individual's employment and the employment termination will be recorded as an involuntary separation.

(2) An employee who resigns after a decision has been made by DD/OS to revoke the employee's access to classified information or a decision has been made by Chief Human Resoursces Officer, with concurrence by the Head of the employee's Career Service, to separate the employee for non-security reasons will be considered to have resigned in lieu of termination and the separation will be recorded as resignation in lieu of termination. An employee who resigns in such circumstances shall be ineligible for separation compensation under AR ▓▓▓ However, a resignation tendered and accepted as outlined above shall be deemed to constitute an *involuntary* separation solely for purposes of determining whether the individual is eligible for a discontinued service retirement annuity under the Civil Service Retirement System or the Federal Employees Retirement System.

(3) Once a final decision is made to involuntarily separate the employee, it will be recorded as an involuntary separation.

(4) The status of the employee's separation, that is, voluntary separation, resignation in lieu of termination, or involuntary separation will be described to state unemployment compensation authorities and/or private sector employers who properly inquire.

(5) An employee who submits a resignation before final EXDIR, DDCI, or DCI review of an appeal will be notified prior to formal acceptance of the resignation that acceptance of the resignation will terminate further processing of the appeal.

(6) If, after a termination recommendation has been made, an employee submits a resignation effective at a future date, D/OS or designee will consult with appropriate officials and determine whether the interests of the U.S. require continuation of procedures to effect an earlier termination.

(7) D/OS, in his or her discretion and in accordance with applicable law, may waive any of the provisions of paragraphs (1) through (6) above if D/OS determines such a waiver or waivers would be beneficial to the interests of the Agency.

**j.  DISCLOSURE OR DISSEMINATION OF REASONS FOR TERMINATION OR RESIGNATION OF EMPLOYMENT**

(1) Generally, the reasons for the termination or resignation of Agency employment shall not be disseminated outside the Agency to any private organization or Federal or other governmental body without the consent of the employee. Absent such consent, and subject to the exceptions noted below, responses to requests for information as to why an individual's employment was terminated shall be limited to a statement that the employment was terminated pursuant to statutory authority. Nothing in this section (section j) shall limit the dissemination of:

(a) Intelligence or counterintelligence information;

(b) Information relevant to a lawful personnel, physical, or communications security investigation or proceeding or a hiring, licensing, or similar decision by another Federal agency;

(c) Information pursuant to a prior written acknowledgment of the employee that the information may be disclosed to other Federal, state, or local government agencies for investigative, administrative, or legal action;

(d) Information concerning possible violation of Federal criminal law, as required by section 1.7(a) of Executive Order 12333 and/or 28 U.S.C. Sec. 535; and/or

(e) Information necessary to protect an individual's life or physical safety or the public health or safety.

(2) The DCI, DDCI, EXDIR, D/OS, or DD/OS in each official's discretion, may waive the provisions of this section (section j) and authorize a disclosure that otherwise would not be permitted under this regulation, *provided that* the disclosure is permissible under the Privacy Act of 1974, as amended (5 U.S.C. 552a), the Agency's Privacy Act regulations, and Executive Order 12333 and the implementing procedures for that order.

(3) This regulation does not require the DCI to disclose the reasons for termination of employment if, in the exercise of his discretion under law, he decides not to do so.

/s/
George J. Tenet
Director of Central Intelligence

CONFIDENTIAL

Date:          02/19/2002 (Regulations may contain various dates)

Category:      Human Resources                    OPR: HR

Title:                    CONTRACT EMPLOYEES

72. (U) CONTRACT EMPLOYEES

(U) SYNOPSIS. This regulation states policy, authorities, and responsibilities for managing contract employees. It does not apply to individuals engaged as independent contractors [          ] and consultants [          ] personnel employed by proprietary projects [          ] or to agents [          ]

a.  (U) AUTHORITY. CIA Act of 1949, 50 U.S.C. 403, as amended; National Security Act of 1947, 50 U.S.C. 402 et seq., as amended; and the CIA Retirement Act of 1964, 50 U.S.C. 2001 et seq., as amended.

CONFIDENTIAL

c.  (U) **DEFINITIONS.**  Contract employees are appointed employees of the US Government and have the entitlements and responsibilities of government employment. Contract employees are required to take the oath of office by appointment affidavit. There are three categories of contract employees:

  (1)  Career Associate (Type C) contract employees perform duties, usually clandestine and operational, on a career basis.

  (2)  Internal (Type I) contract employees are hired for a specific term and normally work inside Agency installations.

CONFIDENTIAL

(3)  External (Type E) contract employees are hired for a specific term and normally work outside Agency installations.

d.  (U) **ELIGIBILITY FOR BENEFITS.** The eligibility of contract employees for various benefits, such as retirement, insurance, leave, and overseas entitlements, is the same as that for staff employees. The type of benefits depends on whether the employee is a US citizen or a permanent resident alien, and whether employment is temporary or term, as well as full-time, part-time, or intermittent (when actually employed). The component HR office will provide specific eligibility information on a case-by-case basis.

CONFIDENTIAL

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER B.                                )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )    Civil Action No. 1:06CV01652 (RWR)
                                        )
CENTRAL INTELLIGENCE AGENCY,            )
        et al.,                         )
                                        )
        Defendants.                     )
                                        )
_____ )

ORDER

Upon consideration of the motion to dismiss by defendants Central Intelligence Agency

and General Michael V. Hayden, the Director of Central Intelligence Agency, and the opposition

thereto, it is hereby

   **ORDERED** that defendants' motion to dismiss is **granted**; it is further

   **ORDERED** that the First Amended Complaint be dismissed with prejudice.


_____                         _____
Date                                    UNITED STATES DISTRICT JUDGE