# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PETER B.                                    *
                                            *
        Plaintiff,                          *
                                            *
        v.                                  *        Civil Action No. 06-1652 (RWR)
                                            *
CENTRAL INTELLIGENCE AGENCY                 *
et al.                                      *
                                            *
        Defendants.                         *
*    *    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS[1]

Plaintiff Peter B., previously worked for the defendants in a covert capacity from approximately the early 1990s to 2003, when he was summarily terminated for no apparent reason. There is no dispute surrounding the acknowledged working relationship between the plaintiff and the defendants, although the specific status that Peter B. held during different time periods is in dispute and relevant to this case.

The thrust of the defendants Central Intelligence Agency and its Director General Michael V. Hayden's (collectively referred to as "CIA") main argument is that it can legally do whatever it wants, whenever it wants, to whomever it wants, absent certain – narrow - constitutional limitations. To some that would appear more reminiscent of societies our country went to war against than the democratic one we presumably still

---

[1] This document has been submitted to and reviewed by the defendant Central Intelligence Agency ("CIA") for classification purposes. As a result it has been approved for public filing in its present form. To the extent any information has been redacted as "classified", the filing of this document does not denote Peter B.'s, or his counsel's, agreement with any classification decisions and he reserves the right to challenge said decisions at the appropriate time. Moreover, depending upon the extent of information redacted, this Court may wish – and certainly has the explicit authority – and likely should review an unredacted version in order to ensure Peter B. receives full due process during these proceedings.

live in. Nevertheless, in light of the specific factual circumstances of this case, this Court should reject the CIA's motion at this early stage and allow discovery to proceed. Whether the CIA's arguments will prevail at a later stage, particularly on the merits, is something that can be determined at that time.

## FACTUAL BACKGROUND

In the early 1990s, Peter B. entered into a covert operational relationship with the CIA. The exact nature of his employment status in this relationship is in dispute. First Amended Complaint at ¶7 (dated January 7, 2007)("FAC"). Peter B. asserts that at a certain point in the 1990s he became a full staff employee possessive of all constitutional, statutory and regulatory rights as is any other CIA employee. This would include, among other things, the usual rights, privileges and benefits that are accorded federal employees. Id. at ¶8.

The CIA asserts Peter B. was some sort of independent contractor whose relationship with the government can be terminated at its convenience. It further claims documentation is in its possession that supports its position but it refuses to reveal the information. Id. at ¶9. During the course of his relationship with the CIA, Peter B. incurred approximately $30,000 - $40,000 worth of operational expenses for which he was never reimbursed. These expenses were incurred under specific instructions of the CIA and proper receipts were submitted. Id. at ¶10.

On or about October 3, 2002, Peter B.'s relationship was formally terminated by the CIA. At no time, despite multiple requests, has he ever been told the reason(s) for his termination other than for the "convenience of the government." Id. at ¶11. Defendants Margaret Peggy Lyons and Does #1-#10 took steps based on their own personal reasons

2

to unlawfully and/or unethically ensure Peter B.'s relationship with the CIA was terminated. This included, but was not limited to, the dissemination of false information concerning Peter B. Id. at ¶12

As a result of the CIA's actions Peter B. was abandoned at his domestic post, where he had been required to live by the CIA in order to receive a specific assignment, and forced to incur significant expenses that exceeded $15,000. Id. at ¶13. Additionally, Peter B.'s CIA sponsored health insurance and Cobra was terminated by the CIA in or around September 2002, even though he continued payment of his premiums. Id. at ¶14.

The actions that led to the circumstance above were undertaken by the CIA through the conduct of Lyons and Does #1-#10. These actions were of a personal nature, unlawful and/or retaliatory. Id. at ¶15. Peter B. was never provided any administrative remedies to challenge the CIA's actions to terminate his employment which, as a federal employee, he was entitled to pursue. This included, but was not limited to, the ability to appeal the CIA's decision to the Personnel Evaluation Board. Alternatively, even as a contractor, Peter B. was entitled to have the CIA follow specific regulations governing termination. Id. at ¶ 16.

Up to the date of the filing of this case and continuing, Peter B. has made numerous efforts to administratively resolve these disputes. In attempting to do so he has incurred more than $35,000 in out-of-pocket expenses that he otherwise would not be responsible for had the CIA acted lawfully. Id. at ¶17. Peter B. has been provided one or more offers of employment with government contractors involved in business operations with the CIA. The work Peter B. was to perform required a security clearance. At the time Peter B. had been terminated by the CIA he possessed a TS/SCI clearance that was still active.

During 2001 – 2006, he was repeatedly informed by CIA representatives that there were no security clearance issues or concerns within his CIA files. These CIA representatives were either unaware of false and inaccurate derogatory information within Peter B.'s files or they lied to him or the CIA has lied to government contractors inquiring about Peter B. Id. at ¶18.

One or more of the government contractors attempted to have the CIA transfer or renew Peter B.'s security clearance. Upon information and belief, the CIA disseminated false and defamatory information concerning Peter B. to the government contractors for the purpose of causing the potential employer to never provide Peter B. with an offer of employment or withdraw any such offer that had been provided. Id. at ¶19.

## ARGUMENT

The CIA has moved to dismiss this case pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Neither attempt should succeed at this juncture.

A motion for dismissal under "Rule 12(b)(1) [of the Federal Rules of Civil Procedure] presents a threshold challenge to the court's jurisdiction ...." Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)(citations omitted). Specifically, Rule 12(b)(1) permits dismissal of a complaint if the court "lacks jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). The "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Amer. Farm Bureau v. EPA, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). In evaluating whether it has subject matter jurisdiction, the court must construe the complaint liberally, and give the plaintiff the benefit of all reasonable inferences. See Tozzi v. EPA, 148 F. Supp.2d 35, 41 (D.D.C. 2001), citing Scheuer v. Rhodes, 416 U.S. 232 (1974). The court must view the

allegations as a whole, and a conclusory averment of subject matter jurisdiction negated by other allegations in the pleading should result in dismissal. Tozzi, 148 F.Supp.2d at 41 (citation omitted).

This rule also imposes "an affirmative obligation [on the Court] to ensure that it is acting within the scope of its jurisdictional authority ... [and for this] reason, the 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than on a 12(b)(6) motion for failure to state a claim." Fowler v. D. C., 122 F. Supp. 2d 37, 40 (D.D.C. 2000)(citations omitted).

A Court is therefore permitted to rely on documents beyond the pleadings to assure itself that it possesses jurisdiction. See Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947); Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986); Artis v. Greenspan, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). By considering documents outside the pleadings to resolve a challenge to the Court's subject matter jurisdiction the Court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment." Haase, 835 F.2d at 905 (emphasis in original). However, an independent inquiry may be undertaken by the Court to assure itself of its own subject matter jurisdiction without triggering *unnecessary* discovery. Id. at 907-08.

However, just because the Court has the power to go beyond the pleadings, it remains "settled law [that] the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P12(b)(1) on the

complaint standing alone." Herbert v. Nat'l Acad. of Science, 974 F.2d 192, 197 (D.C. Cir. 1992). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." Kowal v. MCI Commun. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); Beverly Enters., Inc. v. Herman, 50 F. Supp. 2d 7, 11 (D.D.C. 1999).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The district court must treat the complaint's factual allegations -- including mixed questions of law and fact -- as true and draw all reasonable inferences therefrom in the plaintiff's favor. Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003).

The court need not, however, accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). In deciding a 12(b)(6) motion, district courts may typically consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)(citation omitted). However, the court may, in its discretion, consider matters outside the pleadings and thereby convert a Rule 12(b)(6) motion into a motion for

summary judgment under Rule 56. See Yates v. District of Columbia, 324 F.3d 724, 725

(D.C. Cir. 2003)

## I.   PETER B. HAS BEEN DEPRIVED OF PROTECTED LIBERTY INTERESTS IN RELATION TO HIS TERMINATION AND HIS ATTEMPTS TO OBTAIN SUBSEQUENT EMPLOYMENT[2]

In its Motion to Dismiss the CIA argues that the four due process claims raised in

Peter B.'s complaint should be dismissed due to lack of a protected liberty interest.

Defendants' Memorandum in Support of Motion to Dismiss at 12 ("CIA Memo").

It is undisputed that to state a Fifth Amendment due process claim, a plaintiff must

show that he was deprived of a protected liberty interest. See Bd. of Regents of State

Colleges v. Roth, 408 U.S. 564, 569-570 (1972); M.K. v. Tenet, 196 F. Supp. 2d 8, 15

(D.D.C. 2001). It is similarly undisputed that to establish a deprivation of a liberty

interest in the employment context, a plaintiff must show both that the government

negatively altered his status and that the government:

> stigmatizes the employee or impugns his reputation so as to either
> (1) seriously damage his standing and associations in his community
> ("reputation-plus"), or (2) forecloses his freedom to take advantage of
> other employment opportunities by either (a) automatically excluding him
> from a definite range of employment opportunities within the government
> or (b) broadly precluding him from continuing his chosen career ("stigma
> or disability").

Id.

---

[2] The CIA argues that Peter B's claims set forth under the Administrative Procedure Act ("APA") are precluded by the Civil Service Reform Act. CIA Memo at 5-8. It would appear that if his APA claims were solely to enforce CIA regulations this might be the case. However, the APA also addresses constitutional claims. Thus, the types of claims sought for review by Peter B. under the APA, such as the existing CIA regulations that applied to his case, would still be relevant to any determination of whether his liberty interests were violated. It would appear to make sense, if discovery is to be permitted, to delay ruling on these claims until the facts – especially Peter B.'s employment status with the CIA – are clarified.

For purposes of responding to the CIA's Motion, Peter B. can demonstrate, simply through his FAC, that he has been deprived of a protected liberty interest in regards to the circumstances surrounding the termination of his employment at CIA as well as the statements made to, and interference with, the contractors. Thus, the CIA's Motion should be denied (at least until after discovery is completed).

A.    **Peter B. Has Been Deprived Of A Protected Liberty Interest In Relation To The Derogatory Comments Made Within CIA That Served As The Proximate Cause For His Termination**

It is undisputed that to fit within the "reputation plus" prong, a plaintiff must demonstrate not only that the agency negatively altered his employment status, but also that the agency made "public accusations that will damage [the plaintiff's] standing and association in the community," in connection with the change in employment status.  Doe v. Cheney, 885 F.2d 898, 910 (D.C. Cir. 1999).

The CIA concedes that Peter B. can show a change in employment status by way of the termination of his employment. CIA Memo at 15. However, the CIA contends that he cannot demonstrate that the CIA made any public accusations about him in connection with the termination.  Id. at 15 n.4. To support this assertion the CIA relies on Cheney wherein disclosure of information by the National Security Agency ("NSA") to other federal agencies regarding the NSA's decision to terminate a federal employee was held not to constitute a public accusation. Therefore, the employee's liberty interest was not infringed.  Cheney, 885 F.2d at 910.

The instant case is distinguishable from Cheney, particularly because a more thorough reading of Cheney reveals that the employee in question *consented* to the NSA disseminating the information and the dissemination was conducted with clear limits on

further distribution.  Id. at 910. In contrast, in this case, Peter B. neither consented to the

dissemination by the CIA of any inaccurate and/or derogatory information in question

within various divisions of the CIA nor are there any identifiable known clear limits on

the distribution of the information.

The CIA further contends that even if this dissemination constitutes a public

accusation, the allegation cannot create a protected liberty interest because it challenges

the basis for termination. CIA Memo at 15-16. The CIA incorrectly claims that the M.K.

Court explicitly found that termination of employment does not sufficiently damage a

plaintiff's reputation to create a protectable interest.  Id. at 16, quoting M.K., 196 F.

Supp. 2d at 15.

To the contrary, M.K. merely reiterated the concept that "termination of employment

does not [sufficiently] damage a plaintiff's reputation *without* public accusations that will

damage the plaintiff's standing and associations in the community." M.K., 196 F. Supp.

2d at 15 (emphasis added). In M.K., the plaintiffs did not allege that any public

accusations had been made in connection with the decisions to terminate their

employment.  Id. In contrast, in the instant case, Peter B. has emphatically alleged that

Defendants Lyons and Does #1-#10 disseminated inaccurate and/or derogatory

information throughout the CIA that unlawfully and unethically caused his employment

with the CIA to be terminated. FAC at ¶63.

The D.C. Circuit has endorsed a plaintiff's right to demonstrate to the Court,

obviously after discovery had taken place, to what extent the stigmatizing reasons for

discharge have been disseminated. Doe v. United States Dep't of Justice, 753 F.2d 1092,

1113 (D.C. Cir. 1985). In any event, the public disclosure requirement is met because the

CIA has placed negative information within Peter B.'s files which is "available, even on a limited basis, to prospective employers or government officials." Id. See e.g. Kartseva v. Dep't of State, 37 F.3d 1524, 1528 (D.C. Cir. 1994)(availability of unfavorable information to future potential government employers constitutes status change of due process import).[3]

Accordingly, the CIA's argument that Peter B. cannot demonstrate a deprivation of a protected liberty interest under the "reputation-plus" prong is without merit.

**B.    Peter B. Has Been Deprived Of A Protected Liberty Interest Under The "Stigma" Prong In Relation To The Defamatory Information Disseminated To The Contractors.**

The basis of a claim under the "stigma" prong is the combination of an adverse official action and "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities." O'Donnell v. Barry, 148 F.3d

---

[3] See also Brandt v. Board of Co-Op. Educational Services, 820 F.2d 41, 45 (2d Cir. 1987)(presence of charges in personnel file has damaging effect on future job opportunities); Hogue v. Clinton, 791 F.2d 1318, 1322 n.7 (8th Cir.)(1986)(personnel file replete with wrongdoing sufficient publication if file made available to prospective employers); Bailey v. Kirk, 777 F.2d 567, 580 n.18 (10th Cir. 1985)(presence of false and defamatory information in personnel file may constitute publication if not restricted to internal use); Burris v. Willis Indep. School Dist., Inc., 713 F.2d 1087, 1092 (5th Cir. 1983)(evidentiary hearing required where information contained in files clearly false and possibility exists that information will not be kept confidential); Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 966 (D.C.Cir. 1980)(liberty interest claim exists due to debarment when government agency made written finding and placed it in permanent file accessed by future government decision-makers); Larry v. Lawler, 605 F.2d 954, 958 (7th Cir. 1978)(government stigmatized plaintiff throughout federal government by making information available in files); Velger v. Cawley, 525 F.2d 334, 336 (2d Cir. 1975)(charges entered in personnel file amounted to publication given that "New York City ... grants ready access to its confidential personnel files to all governmental police agencies"), rev'd on other grounds sub nom, Codd v. Velger, 429 U.S. 624 (1977); Ervin and Assoc. et al. v. Dunlap et al., 33 F.Supp.2d 1, 10 (D.D.C. 1997)(allegations that government officials made disparaging and defamatory statements that effectively barred plaintiff from future contracts with defendant sufficient to overcome motion to dismiss).

1126, 1140 (D.C. Cir.1998), quoting Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972)

(modifications in original). The CIA contends that Peter B. cannot demonstrate a

deprivation of a protected liberty interest under the "stigma" prong in relation to any

statements made or information disseminated by the CIA to contractors as the statements

were not made in connection with the termination decision. Rather, the statements were

made in relation to Peter B.'s subsequent applications for employment with the

contractors, and he had no protected right to a security clearance or to employment in the

national security arena. CIA Memo at 16-17, 19.

First, the CIA asserts that defamation alone, absent any connection to an alteration in

Peter B.'s employment status, is not sufficient to implicate a liberty interest, even if it

precludes future employment. Id. at 17; see Siegert v. Gilley, 500 U.S. 226, 233-34

(1991); O'Donnell, 148 F.3d at 1140. The CIA, however, has misconstrued the

limitations described in Siegert, and then clarified in O'Donnell. Although the O'Donnell

Court identified an adverse employment action as one *possible* change in status that

would suffice to implicate a liberty interest, it continued to state that all that what was

necessary was "some tangible change in status." Id. 148 F.3d at 1141 (emphasis added).

Courts in this Circuit have subsequently adhered to the policy that "there are several

ways in which the government may cause a change in status, including discharging the

employee, *foreclosing the employee's future employment opportunities*, or reducing the

employee's rank or pay." Ranger v. Tenet, 274 F. Supp. 2d 1, 7 (D.D.C. 2003), quoting

Doe v. Casey, 796 F.2d 1508, 1523 (D.C. Cir. 1986)(emphasis added). See also Mosrie v.

Barry, 718 F.2d 1151, 1161 (D.C. Cir. 1983)(finding that "foreclosure of a right to be

considered for government contracts in common with all other persons" sufficed as a change in status).

Thus, a negative change in a plaintiff's status adequate to implicate a liberty interest can be found where a federal agency's conduct has the "broad effect of precluding [the employee] from pursuing [their] chosen career." Kartseva, 37 F.3d at 1528. In Kartseva, a Russian language translator was dismissed from work with a government contractor due to an unfavorable background investigation by the State Department ("DOS"). Id. at 1525. The only information provided to explain the unfavorable determination by DOS was that there were several "counterintelligence concerns." Id. The D.C. Circuit in Kartseva upheld the notion that DOS's decision to declare Kartseva as ineligible for assignment on DOS projects due to the unexplained "counterintelligence concerns" had sufficiently changed her status and had the broad effect of precluding Kartseva from her chosen career without affording her any due process. Id. at 1529. See also Greene v. McElroy, 360 U.S. 474, 492 (1959)("Revocation of a security clearance possibly implicates a Fifth Amendment liberty interest where action has seriously affected, if not destroyed, plaintiff's ability to obtain employment [in his chosen career.]"). In the instant case, Peter B.'s status, like that of Kartseva, was adequately altered, as he has been broadly precluded from work in his chosen career due to the inaccurate and/or derogatory statements made by the CIA to contractors concerning him.[4] See Declaration of Mark S.

---

[4] One such example of the preclusion that the CIA has caused led to Peter B's termination from an employment contractor with a major defense contractor doing business with the CIA. See Exhibit "1". While the e-mail messages are cryptic, which should not be surprising given the context, the "customer" is the CIA and Peter B. was informed in other conversations that statements made by the CIA were responsible for the sudden sea change. Discovery will, of course, flesh out these facts.

Zaid, Esq. at ¶¶8-10 (dated June 17, 2007)("Zaid Decl."), attached at Exhibit "2". As a result, the CIA has caused a status change adequate to implicate a liberty interest.

In response to this anticipated argument the CIA counters that Peter B.'s characterization of the statements as inaccurate and/or derogatory is flawed as it ignores the classified nature of his employment with the CIA. The CIA apparently relies upon a Glomar response to support their decision to refuse to confirm or deny plaintiff's "true identity as a CIA employee or the extent to which he possesses security clearances." CIA Memo at 18.[5] This is an intentionally misleading argument, both factually and legally, particularly because the revelation of the "covert" relationship between Peter B. and the specific contractors is not at issue. In fact, the contractors involved in this dispute, who most likely themselves held TS/SCI clearances, were fully aware of the pre-existing relationship due to prior dealings with Peter B. It should come as no surprise that many employees of contractors are former CIA employees themselves. See Zaid Decl. at ¶8. The prior covert relationship between Peter B. and the contractors was irrelevant and not,

---

[5] Exactly what the CIA is seeking to accomplish by invoking Glomar is unknown. A Glomar response, which is derived from Phillippi v. CIA, 546 F.2d 1009, 1013 (D.C. Cir. 1974), is a term utilized in Freedom of Information Act cases. In fact, not one case such as the instant matter has been identified, and the CIA certainly cites to none, outside of the FOIA context where a court permitted a Glomar response. In any event, even in FOIA cases in which the CIA has legitimately utilized the Glomar response the courts have held that CIA still must "provide a public affidavit explaining in as much detail as possible the basis for its claim." Wheeler v. CIA, 271 F. Supp. 2d 132, 139 (D.D.C. 2003), quoting Phillippi, 546 F.2d at 1013. Furthermore, appropriate discovery is permitted "when necessary to clarify the Agency's position or to identify the procedures by which that position was established." Wheeler, 271 F. Supp. 2d at 139; Cf. Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 25 (D.D.C. 2000)(finding that discovery can be appropriate when the plaintiff can raise sufficient question as to the agency's good faith). The CIA has not provided any affidavit or similar explanation to justify the basis for its decision to terminate his employment other than that it was for the "convenience of the government."

to Peter B.'s knowledge, a factor in any of the decisions that led to the constitutional

violations in this case. Thus, there is no classified or Glomar dispute in this case.

The CIA also claims that even to the extent it disseminated inaccurate and/or

derogatory statements that broadly precluded Peter B. from his career and sufficiently

changed his status he still cannot establish a liberty interest because he has no right to

employment in the national security arena or to a security clearance. But see Zaid Decl. at

¶¶9-10. To support its assertion, the CIA – beyond the fact that it is twisting Peter B.'s

claims into arguments that are not being proffered – incorrectly relies on two cases for

the premise that "no one has a right to a security clearance." CIA Memo at 19 citing

Dep't of Navy v. Egan, 484 U.S. 518, 528 (1988); Cheney, 885 F.2d at 909-10.[6] The

Courts in Egan and Cheney opined that individuals do not have a right to a security

clearance *only* in the context of that clearance constituting a protected property interest.

Egan, 484 U.S. at 528; Cheney, 885 F.2d at 909.[7]

Peter B. has not claimed he has a protected property interest in his security clearance.

Rather, he has argued that the CIA's conduct in disseminating defamatory information

concerning his past employment status, and the extent to which he validly possesses (or

---

[6] The CIA also references Dorfmont v. Brown, 913 F.2d 1399, 1403 (9th Cir. 1990), but this case conflicts with D.C. precedent as set forth in Kartseva.

[7] Egan, which is always held out by the government in any case where a plaintiff even raises a mere mention of a security clearance, is continually misconstrued by courts as far more expansive than its precedental value. While there is certainly dicta within the decision that is helpful to the government, the case itself merely addresses the breadth of the statutory jurisdiction of the Merit Systems Protection Board in matters involving clearance challenges. Id. 484 U.S. at 520 ("The *narrow question* presented by this case is whether the Merit Systems Protection Board (Board) has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action.")(emphasis added).

possessed) a security clearance has broadly precluded him from his chosen career and therefore implicated a protected liberty interest.

Lastly, the CIA argues that even if all of Peter B.'s arguments above are found to be true, there is simply no legal basis for the relief sought, i.e., namely to rescind the termination decision. CIA Memo at 20. However, the CIA has misinterpreted Peter B.'s Prayer for Relief. Peter B. is not seeking to have the Court overturn the CIA's authority, even if discretionary, and reinstate his employment, but to require either the CIA to afford him proper internal due process or a name-clearing hearing. FAC, at Prayer for Relief. As stated by the Supreme Court, if a protected liberty interest is found to have been infringed upon, the aggrieved individual must be afforded an opportunity to refute the charges and clear his name. Codd, 429 U.S. at 627; Ranger, 274 F. Supp. 2d at 9. No such opportunity has been afforded to Peter B. at any point since his termination.

Accordingly, the CIA's argument that Peter B. cannot demonstrate a deprivation of a protected liberty interest under the "stigma" prong is without merit.

### C.  At A Minimum, Peter B. Is Entitled To Discovery On His Fifth Amendment Claim Before The CIA Deserves Dismissal Of This Case

In one of the leading cases in this Circuit involving Fifth Amendment liberty interests and federal employment, it was argued in Kartseva that her discharge from employment as a Russian translator excluded her from future employment in her chosen career thereby implicating her Fifth Amendment liberty interest. 37 F.3d at 1526. The Court of Appeals reversed the District Court's dismissal in order to allow for discovery to take place so that at least three important questions could be resolved:

> (1) the scope of State's express disqualification - in particular, whether State's internal recommendation that Kartseva "no secure a position in support of any Department of State contract," refers only to the Statistica contract from which Kartseva was removed, to all Statistica contracts with State, or, indeed, to *any* State contract; (2) the extent to which

> State's Action as to Kartseva would normally be available to and would
> legally affect other government agencies or private employers in their
> decisions whether to employ her or permit her to work on government
> contracts; and (3) the extent to which the disqualification will affect
> Kartseva's ability to pursue her vocation as a Russian translator.

Id. at 1530 (emphasis original). See also Orange v. District of Columbia, 59 F.3d 1267,

1275 (D.C.Cir. 1995)(discovery permitted to prove Fifth Amendment Constitutional

claims); Hogue v. Clinton, 791 F.2d 1318, 1321 (8th Cir. 1986)(bench trial permitted on

plaintiffs' Constitutional claims; Bailey v. Kirk, 777 F.2d 567, 569 (10th Cir. 1985)

(depositions permitted on Fifth Amendment claims). These questions are similar, if not

identical, to some of those that must be answered in this case: (1) what is the scope of the

CIA's dissemination of inaccurate and/or unfavorable information concerning Peter B.?;

(2) to what extent is this information available to other government agencies or private

employers?; (3) to what extent do the CIA's actions foreclose Peter B. from pursuing his

vocation?; and (4) what regulations, rules or policies specifically applied to Peter B.'s

situation?[8] Each of these questions are proper for discovery and should be answered prior

to any contemplation of dismissal of this action.[9]

---

[8] Although the CIA provided copies of regulations it alleged applied to Peter B.'s
situation, each of these did not take effect into 2002. While it is true Peter B. was
terminated by the CIA in 2003, that does not necessarily mean these regulations applied
for his relationship/employment commenced more than ten years earlier and it is not at all
clear that these regulations extinguished or superseded any prior regulations that did
apply. Moreover, the purported regulation concerning "Contract Employees" is highly
redacted presumably due to its alleged CONFIDENTIAL classification status. At the very
least Peter B.'s counsel, who has been approved for access to the SECRET level (one
above CONFIDENTIAL), should be permitted the opportunity to review an unredacted
copy in order to properly address its contents.

[9] Furthermore, both Peter B. and Kartseva named unnamed government employees as
defendants. See FAC at passim; Kartseva, 37 F.3d at 1530. The Court of Appeals in
Kartseva reversed the District Court's dismissal of the Bivens claims against the
unnamed defendants because the threshold "'essential legal question whether the conduct
of which the plaintiff complains violated clearly established law,'" was never decided. Id.

Moreover, to the extent the CIA seeks to dissuade this Court from permitting discovery due to the presumed classification status of the information, the Supreme Court soundly rejected such a premise by the CIA in <u>Webster v. Doe</u>, 486 U.S. 592 (1988), wherein it noted that the "District Court has the latitude to control any discovery process which may be instituted so as to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission." <u>Id</u>. at 604.

## II.  PETER B.'S CLAIMS UNDER THE PRIVACY ACT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR RELIEF.

In its Motion to Dismiss the CIA contends that the three Privacy Act claims raised in Peter B.'s First Amended Complaint should be dismissed for failure to state a claim for relief. CIA Memo at 20-27. However, Peter B. can demonstrate that he has pled viable claims for relief under subsections (e)(2), (e)(5), and (e)(6) of the Privacy Act and that the CIA's Motion to Dismiss lacks merit and should therefore be denied.

---

(citation omitted). The Court elaborated that:

> [w]here, as here, the resolution of the threshold question of the existence of a clearly established constitutional right requires information on the nature and effects of the government action that is exclusively within the domain of the government, limited discovery may be appropriate to determine that threshold issue.

<u>Id</u>. Although the issue of the individual named and unnamed defendants are not yet before this Court (as service has been unsuccessful to date for Margaret Peggy Lyons and the unknown defendants remain just that until discovery), discovery against the primary agency defendants would overlap with the individual defendants. Another case from this Circuit that would appear to support Peter B.'s claim for discovery is that of <u>Doe v. United States Dep't of Justice</u>, 753 F.2d 1092 (D.C.Cir. 1985), which survived the government's Motion to Dismiss. <u>Id</u>. at 1102 ("Doe's discharge amidst allegations of unprofessionalism implicates a constitutionally protected liberty interest in reputation and that, if those allegations were publicly disclosed, she is entitled to an opportunity to clear her name."). The Court of Appeals seems to comment in dicta that discovery should have been permitted by the District Court so the record would not be as sparse on appeal. <u>Id</u>. at 1098.

**A.    Plaintiff's Claims Under Counts VI, VII, and VIII Should Not Be Dismissed For Failure To Sufficiently Plead The Facts.**

The CIA claims that Peter B. has failed to provide sufficient factual assertions in his complaint to support a claim for relief under any of the three counts. It argues that Peter B. has not identified "the records which are allegedly inaccurate or to whom and when CIA allegedly disseminated information," as well as "what information was allegedly not collected from him directly or how this purported information is inaccurate." CIA Memo at 22, 24. Of course, a complaint "must at least include some factual assertions to put [the government] on notice of 'the event being sued upon.'"  Flowers v. The Exec. Office of the President, 142 F. Supp. 2d 38, 46-47 (D.D.C. 2001). But complaints do not have to "plead law or match facts to every element of a legal theory."  Krieger v. Fadely, 211 F.3d 134, 136 (D.C. Cir. 2000); cf., Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)(holding that courts must construe a complaint in the light most favorable to the plaintiff and grant the plaintiff the benefit of all inferences that can be derived from the facts alleged).

Furthermore, "pleadings on information and belief are permitted when the necessary information lies within defendant's control." Flowers, 142 F. Supp. 2d at 47. The need for this more liberal and elastic construction of the pleading requirement is most evident in cases involving classified information, where the aggrieved individual would obviously "not even know the precise contents of his records because they are classified and he has no access to them." Doe v. Goss, 2007 U.S. Dist. LEXIS 2708, 31 (D.D.C. 2007), attached at Exhibit "3", citing Krieger, 211 F.3d at 136.

In this case, Peter B. has adequately and sufficiently complied with the pleading requirements. In terms of the inaccurate and/or derogatory information that was used as

the basis for his termination, and which contains inaccuracies due to the CIA's failure to collect information directly from Peter B., Peter B. clearly identified the relevant record as being his own personnel file, particularly the records pertaining to his security clearance. FAC at ¶20. In terms of the inaccurate records which were disseminated, Peter B. identified that all relevant records would be held within an applicable Privacy Act Systems of Records within CIA and that defendants Lyons and Does #1-10 were involved in disseminating inaccurate and/or derogatory information throughout the CIA and to the unspecified contractors, whose identity is known to Plaintiff and would be available within the relevant records. Id. at ¶13, 14, 17, 21, 69.

Accordingly, the CIA's argument that Peter B.'s claims under the Privacy Act have not been sufficiently pled is without merit.

### B. Peter B.'s Claim Under Count VI That CIA Violated 5 U.S.C. §552a(e)(2) Should Not Be Dismissed For Failure To State A Claim.

It is undisputed that in order to show a violation of 5 U.S.C. §552a(e)(2), a plaintiff must show that (1) the agency did not collect information to the greatest extent practicable directly from him, (2) as a result it made an adverse determination about him with respect to a right, benefit and privilege under Federal Programs, and (3) the violation was "intentional and willful." Walter v. Thornburgh, 888 F.2d 870, 972 (D.C. Cir. 1989).

In so far as the adverse determination in question is the decision to terminate Peter B.'s employment, the CIA put forth two defenses: (1) that the claim is barred by the statute of limitations; and (2) that the claim seeks to circumvent the CSRA, which was enacted to preclude judicial review of CIA personnel decisions. CIA Memo at 24.

First, the Privacy Act requires that an action to enforce its provisions must be brought "within two years from the date on which the cause of action arises." 5 U.S.C.

§ 552a(g)(5). However, the courts have permitted a more elastic construction of the statute of limitations in cases "in which the agency has materially and willfully misrepresented information that is material to establishing its own liability under the [Privacy] Act." Tijerina v. Walters, 821 F.2d 789, 794 (D.C. Cir. 1987). In such cases, "the action may be brought at any time within two years after discovery by the individual of the misrepresentation" and the "statute of limitations does not begin to run until the plaintiff knows or should know of the alleged violation." Id.; see also, Pope v. Bond, 641 F.Supp. 489, 499-500 (D.D.C. 1986).

In the instant case, due to the CIA's intentional and willful misrepresentation of information concerning Peter B. he did not become aware of the violation until the rescission of the offer of employment from the contractors which occurred as recently as 2006. See Exhibit "1". Therefore, his claim under the Privacy Act is not barred by the statute of limitations.

The CIA's second defense is that Peter B.'s claim under the Privacy Act is barred from review because it would circumvent the preclusive intent of the Civil Service Reform Act ("CSRA") by permitting judicial review of a CIA personnel decision. CIA Memo at 25. The CIA mistakenly relies on case law that deals solely with situations in which the aggrieved individuals were afforded some manner of administrative due process and were seeking to use the Privacy Act as a mechanism for circumventing established regulatory or statutory provisions. See e.g. Kieman v. Dep't of Energy, 956 F.2d 335, 338 (D.C. Cir. 1992)(finding that a federal employee challenging a classification determination, who had submitted and then withdrawn an administrative appeal seeking a classification review, could not circumvent the CSRA's preclusion of

judicial review of classification decisions through the Privacy Act but rather had to utilize the available administrative process); Pellerin v. Veterans Admin., 790 F.2d 1553, 1555 (11th Cir. 1986)(dismissing a veteran's claim under the Privacy Act as an obvious attempt to circumvent established regulatory procedures for challenging an agency determination concerning medical benefits).

In contrast, Peter B. is relying on the constitutional claim that the CIA deprived him of a protected liberty interest by publicly disseminating inaccurate and/or derogatory information that damaged his reputation and resulted in his termination from the CIA. See supra Part I.A. The Supreme Court, for its part, has refused to find that the CSRA or §102(c) of the National Security Act of 1947 ("NSA Act") were designed to preclude colorable constitutional claims from being raised in relation to CIA personnel decisions. Webster, 486 U.S. at 604. Therefore, so long as Peter B. can demonstrate a deprivation of a protected liberty interest, his claim under the Privacy Act is not barred from judicial review.

Even if it is found that colorable constitutional claims are preempted by the CSRA for purposes of the Privacy Act or, alternatively, that Peter B. cannot demonstrate a deprivation of a protected liberty interest, his Privacy Act claim is still not preempted by the CSRA so long as the "harm alleged was actually caused by the alleged violation." Doe, 2007 U.S. Dist. LEXIS at 28, citing Hubbard v. EPA, 809 F.2d 1, 5 (D.C. Cir. 1986). See also Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988)(en banc)(finding that while the CSRA precludes judicial review of prohibited personnel actions, the District Courts retain jurisdiction to award damages for an "adverse personnel action actually caused by an inaccurate or incomplete record"). Put more simply, in this case, so long as

Peter B. has sufficiently alleged that his termination from CIA was caused by the inaccurate information in his records, his Privacy Act claim is not precluded by the CSRA.

Peter B. has alleged that the CIA compiled inaccurate and/or derogatory information that was used as the basis for his termination and that the CIA's failure to seek information from him resulted in the inaccurate and/or derogatory information that was the proximate cause of his termination from CIA. FAC at ¶¶68-104.

Accordingly, the CIA's argument that Peter B. has failed to state a claim for relief under subsection (e)(2) of the Privacy Act is without merit.

### C. Peter B.'s Claims Under Counts VII and VIII That CIA Violated 5 U.S.C. §552a(e)(5) and (e)(6) Should Not Be Dismissed For Failure To State A Claim.

It is undisputed that to state a claim under subsection (e)(5), a plaintiff must demonstrate that (1) he has been aggrieved by an adverse determination, (2) the CIA failed to maintain his records with the degree of accuracy necessary to assure fairness in that determination, (3) that CIA's reliance on the inaccurate records was the proximate cause of the determination, and (4) the CIA acted willfully and intentionally in failing to maintain accurate records. Deters v. United States Parole Comm'n, 85 F.3d 655, 657 (D.C. Cir. 1996). It is similarly undisputed that to state a claim under subsection (e)(6), a plaintiff must show that (1) the agency disclosed records about him to another person other than an agency, (2) the CIA failed to make reasonable efforts to assure that the records are accurate, complete, timely and relevant for agency purposes, (3) he was aggrieved by an adverse determination, (4) the inaccurate determination provided by the CIA was the proximate cause of an adverse determination, and (5) the CIA acted

willfully and intentionally in failing to assure accurate records were disclosed. Logan v. Dep't of Veterans Affairs, 357 F.Supp.2d 149, 154 (D.D.C. 2004).

The CIA's only stated defense is that Peter B.'s depiction of his records being inaccurate is flawed. It argues that Peter B.'s claim ignores the classified nature of his employment with the CIA and that the CIA did not provide "inaccurate information" in refusing to confirm or deny his employment status with CIA or the extent to which he possesses a security clearance. CIA Memo at 23.

First, there is absolutely no exception to the Privacy Act where classified documents (and Peter B. does not concede that all of the relevant records or information would be classified) are concerned. The statute fails to provide such an exception, and neither does any case law.

Second, the contested issue is not that the CIA failed to confirm Peter B.'s prior relationship due to the classified nature. This, as stated earlier, is a complete straw man's argument proffered by the CIA. Peter B.'s prior relationship with the CIA was not an issue. Zaid Decl. at ¶9.

Third, the real issue is the false derogatory and inaccurate information that the CIA provided to third parties, without authorization, in order to harm Peter B.

Moreover, as explained earlier, the Glomar response is not an "absolute shield," and agencies invoking it must still "provide a public affidavit explaining in as much detail as possible the basis for its claim." Supra fn.4 (noting that discovery can be permitted if necessary to clarify the agency's position or if sufficient question has been raised concerning the agency's good faith).

Therefore, given the clear dearth of information from the CIA concerning the reason behind Peter B.'s termination, the apparent contradictions between assurances by CIA officials to him that his file was clear of any security clearance "problems" and the subsequent statements made by the CIA to the defense contractors concerning Peter B.'s file, and the resulting rescission of an offer of employment by the contractors due to security concerns, the CIA is not entitled to dismissal of this claim at this time.

Accordingly, the CIA's argument that Peter B. has failed to state a claim for relief under subsections (e)(5) and (e)(6) of the Privacy Act is without merit.

**D.  At This Initial Stage, Discovery Is Justified On Peter B.'s Privacy Act Claims**

As part of its defense the CIA seeks to proffer factual and legal explanations as to the process that would take place with respect to the dissemination of information concerning Peter B.'s clearance status. CIA Memo at 26. Peter B. disputes these arguments. Zaid Decl. at ¶9. However, this is an area ripe for elaboration through discovery, particularly as it relates to information that would be in the possession of the defendants and not the plaintiff. As is whether or not the CIA acted in an "intentional or willful" manner. CIA Memo at 27.

Courts routinely first permit discovery in Privacy Act cases such as this one before dismissal is contemplated. Even a quick review of decisions within the last few years reveals this to be true. See e.g., Tripp v. DoD, 219 F. Supp. 2d 85, 93-94 (D.D.C. 2002); Murphy v. United States, 167 F. Supp. 2d 94, 97 (D.D.C. 2001); Alexander v. FBI, 194 F.R.D. 316, 319 (D.D.C. 2000); Sirmans v. Caldera, 27 F. Supp. 2d 248, 249 (D.D.C. 1998); Scarborough v. Harvey, 2007 U.S. Dist. LEXIS 36952, *2 (D.D.C. May 22, 2007); Doe v. Goss, 2007 U.S. Dist. LEXIS 2708; Hutchinson v. Tenet, 2003 U.S. Dist.

LEXIS 26182 (D.D.C. August 28, 2003); <u>Melius v. Nat'l Indian Gaming Comm'n</u>, 2000

U.S. Dist. LEXIS 22747, *1 (D.D.C. July 21, 2000).[10]

## III.  TRANSFER OF THIS CASE IS INAPPROPRIATE AS IT WOULD NEITHER BE CONVENIENT NOR SERVE THE INTERESTS OF JUSTICE

In an action where venue is proper, 28 U.S.C. § 1404(a) nonetheless authorizes a

court to transfer a civil action to any other district where it could have been brought "for

the convenience of parties and witnesses, in the interest of justice[.]" 28 U.S.C.

§ 1404(a). Section 1404(a) vests "discretion in the district court to adjudicate motions to

transfer according to [an] individualized, case-by-case consideration of convenience and

fairness." <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 27 (1988)(citation omitted).

Under this statute, the moving party bears the burden of establishing that transfer is

proper. <u>Trout Unlimited v. Dep't of Agric.</u>, 944 F. Supp. 13, 16 (D.D.C. 1996).

Accordingly, the CIA must make two showings to justify transfer. First, it must

establish that Peter B. originally could have brought the action in the proposed transferee

district. <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 622 (1964). Second, it must demonstrate

that considerations of convenience and the interest of justice weigh in favor of transfer to

that district. <u>Trout Unlimited</u>, 944 F. Supp. at 16.

As to the second showing, the statute calls on the court to weigh a number of case-

specific private and public-interest factors. <u>Stewart Org.</u>, 487 U.S. at 29. The private-

interest considerations include: (1) the plaintiff's choice of forum, unless the balance of

convenience is strongly in favor of the defendants; (2) the defendant's choice of forum;

---

[10] Peter B. would be happy to provide the Court with a proposed discovery plan, as did counsel in <u>Leighton v. CIA</u>, 2007 U.S. Dist. LEXIS 26667, *4-*6 (D.D.C. April 11, 2007), in successfully overcoming the CIA's Motion to Dismiss under Rule 12(b)(6).

(3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. Trout Unlimited, 944 F. Supp. at 16, citing Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). The public-interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. Id.

Analyzing and balancing these factors should persuade this Court that a transfer of venue to the Eastern District of Virginia ("EDVA") is neither appropriate nor necessary.

### A.  Peter B. Chose This Forum To Litigate His Claim

Courts must afford substantial deference to a plaintiff's choice of forum. S. Utah Wilderness Alliance v. Norton, 315 F. Supp. 2d 82, 86 (D.D.C. 2004); Greater Yellowstone Coalition v. Bosworth, 180 F. Supp. 2d 124, 128 (D.D.C. 2001). See also Pain v. United Tech. Corp., 637 F.2d 775, 784 (D.C. Cir. 1980)(finding that the moving party "bears a heavy burden of establishing that plaintiff's choice of forum is inappropriate"). That deference is only lessened if the moving party can demonstrate that the forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." Greater Yellowstone Coalition, 180 F. Supp. 2d at 128.

The CIA claims that because Peter B. does not reside in the District of Columbia ("D.C.") and the events giving arise to his claims did not occur in D.C., this case has no meaningful ties to DC and transfer is therefore appropriate. This argument is flawed for multiple reasons.

First, Peter B.'s claims have an obvious and significant relation to D.C., namely that the claims involve a federal statute, the Privacy Act, which specifically allows for venue in D.C. 5 U.S.C. §552a(g)(5).

Second, the D.C. Courts have found venue to be appropriate in D.C. in cases involving the CIA due to the extensive amount of work done in DC by the DCI. See Bartman v. Cheney, 827 F. Supp. 1, 2 n.2 (D.D.C. 1993), relying on Doe v. Casey, 601 F. Supp. 581, 584-85 (D.D.C. 1985), rev'd on other grounds, 796 F.2d 1508 (D.C. Cir. 1986). Although the passage of the National Security Intelligence Reform Act of 2004 ("NSIRA"), 50 U.S.C. §§ 402 et seq., transferred significant portions of the DCI's duties to the Director of National Intelligence ("DNI"), no court has yet found any reason to reject the holding in Bartman. The CIA, however, requests that this Court to do just that without providing any factual basis to believe that the DCI does not still conduct extensive amount of work in D.C. If this is an argument that the CIA wishes to pursue, Peter B. should be permitted to conduct discovery on this issue before a determination is reached by the Court.

Third, although the CIA claims that no events arose in D.C., the burden is on the moving party to provide evidence that would disprove assertions that certain activities occurred in the chosen forum. See Greater Yellowstone Coalition, 180 F. Supp. 2d at 128. The CIA maintains several offices in D.C., not only for the DCI but also for its employees, and Peter B. clearly stated that, "upon information and belief, events pertaining to Peter B. took place within this jurisdiction." FAC, at ¶5.

The CIA has failed to provide any evidence that demonstrates that its actions, or that of the individual defendants Lyons and Does #1-10, were not, in fact, undertaken in whole or in part within the geographical confines of the District of Columbia.

**B.  EDVA Is Not A More Convenient Forum**

In terms of pure geographical distance, there is no difference in the convenience for the witnesses or, for that matter, the parties, between the two forums. These are sister jurisdictions. The difference in convenience between the two courthouses is negligible. With the exception of Peter B., who remains abroad for the time being, many of the witnesses and the parties live or work within the greater D.C. Metropolitan Area. In fact, defendant Lyons allegedly currently works for the Director of National Intelligence in Washington, D.C. See "Stay Away From Spooky Women", *Time Magazine*, July 18, 2006 (noting that Lyons is detailed by the CIA to the DNI), available at *http://www.time.com/time/magazine/article/0,9171,1215797,00.html*. Therefore, in terms of parties and witnesses, there is no greater convenience in EDVA as opposed to D.C.[11]

**C.  The Public Interest Lies With Keeping This Case In The District Of Columbia**

Defendants do not make any reference to the public interest factors that can be considered in determining whether a transfer is appropriate, but that does not make them any less valid or significant. The factors for this Court to consider in determining whether it is in the public interest to transfer a case include: (1) the transferee court's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferee and

---

[11] To the extent the CIA holds any security concerns regarding the classification status of witnesses or information, Peter B. would have no objection to allowing depositions at secure agency facilities outside of this jurisdiction if necessary, even though the mere fact that the presence of these witnesses in D.C. would be unlikely to raise any questions.

transferor courts; and (3) the local interest in deciding local controversies at home.

McClamrock v. Eli Lilly & Co., 267 F. Supp. 2d 33, 41 (D.D.C. 2003)(citation omitted).

Furthermore, the courts can also consider whether the defendants are forum shopping.

Ferens v. John Deere Company, 494 U.S. 516, 527 (1990).

First, due in large part to the specific grant of jurisdiction provided for in the Privacy

Act, it goes without saying that the D.C. Courts have considerable familiarity with the

governing law. See e.g. Bartman, 827 F. Supp. at 2; Greater Yellowstone Coalition,

180 F. Supp. 2d at 128. Furthermore, there are numerous examples of litigation within

D.C. which has involved the CIA as a defendant in which transfer either was never

sought or was denied (and the undersigned counsel has handled many of them). See e.g.

Ciralsky v. CIA, 355 F.3d 661 (D.C.Cir. 2004); M.K. v. Tenet, 196 F. Supp. 2d 8; Doe v.

Goss, 2007 U.S. Dist. LEXIS 2708; Harbury v. Deutch, Civil Action No. 96-00438

(D.D.C.)(CKK). It would seem prudent to ask why Peter B.'s case is any different from

other cases where none of the parties reside in D.C. but the claims have been litigated in

this jurisdiction.

Second, this is very much a local controversy that should be decided by the D.C.

Courts. Considering the substantially larger number of Privacy Act cases brought in DC

compared to all other jurisdictions, logic dictates that transfer to another district based

largely on technicalities, such as the actual presence of the CIA's primary office in

Virginia, is neither sufficient nor adequate standing alone.

Finally, considering the relative expertise of the D.C. Courts in dealing with Privacy

Act litigation in comparison with EDVA, as well as the lengthy history of CIA cases that

have transpired within D.C. without argument, it begs the question of whether the CIA is

engaging in forum shopping by seeking to transfer the case to a jurisdiction where it knows, due to other cases, Peter B.'s attorney is not licensed to practice. Zaid Decl. at ¶2.

Accordingly, the CIA's Motion to Transfer this case to the EDVA should be denied.

## **CONCLUSION**

Based on the foregoing, the defendants' Motion to Dismiss should be denied without prejudice and the plaintiff should be permitted to conduct discovery.

Date:   June 18, 2007

Respectfully submitted,

/s/

_____

Mark S Zaid, Esq.
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, DC 20006
(202) 454-2809
(202) 330-5610 fax
ZaidMS@aol.com

Attorney for the Plaintiff

On 10/4/06, **brad juneau** < juneaubj@gmail.com > wrote:
peter we need to speak.  in our brief interaction i think you find me honest and frank.  this relationship is trending in a direction i may not be able to recover.

the customer you met with has declined any interest.  their decline was a 'firm' decline.

additional research on our side re your utility from there is finding some inconsistancies in what you provided and what is a matter of public record.

please let me know when we can speak via telephone.
b


On 10/4/06, **Peter [DELETED]** <DELETED > wrote:
Confirm receipt of your instructions.   I have managed to clean up a few things and still working to that end.  Do you want me to call you? p


On 10/4/06, **brad juneau** < juneaubj@gmail.com > wrote:
peter,

we need to speak.  there are a number of things that have either surfaced or brewing that may undo what we are trying to do here.

until we speak, please stand down on all activities.

again, stand down on all activities.  do not expend either money, time or energy until we speak.
b

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PETER B.                                       *
                                               *
     Plaintiff,                              *
                                               *
     v.                                       *          Civil Action No. 06-1652 (RWR)
                                               *
CENTRAL INTELLIGENCE AGENCY                    *
<u>et al.</u>                                  *
                                               *
     Defendants.                              *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**DECLARATION OF MARK S. ZAID, ESQ.**</u>

The undersigned hereby declares as follows:

    1.  I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge. This Declaration is submitted in support of the plaintiff's Opposition to Defendants' Motion to Dismiss.

    2.  I am an attorney for the plaintiff in this matter. I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York.

    3.  I have been litigating cases involving the federal government, and specifically the defendant Central Intelligence Agency ("CIA"), for nearly fifteen years; essentially my entire professional legal career. I have represented hundreds of federal employees and contractors who work within the United States Intelligence and Military Communities, many of whom have been employed by the CIA in a covert position.

    4.  In many of my cases I have been provided authorized access to classified information. I presently have what the CIA calls a "limited security access approval" to SECRET level information relevant to a particular case (which is generally limited to information shared by the individual client as the CIA, as an institutional matter, routinely

refuses to provide access to any information). To my knowledge, this term does not exist in any Executive Order governing access to classified information, or holds any statutory or regulatory origin. Essentially, it is a CIA created term that is equivalent to the granting of an interim SECRET level clearance. However, it should be noted that the documentation that I execute, copies of which are attached at Exhibit "A", in order to gain access to classified information would seem to clearly reflect I am granted the equivalent of a SECRET clearance. Indeed, the authority from which the documents primarily originate is that of Executive Order 12958. As part of this lawsuit, I have been cleared by the CIA to have access to classified information concerning the plaintiff Peter B., including his true identity and relevant work history. Whether or not I have a "need-to-know" relevant information in the possession of Peter B. lies with him, although I have no ability to handle or store classified documentation.

5.    I have represented Peter B., and members of his family, since in or around 2003, in an effort to resolve numerous disputes that have arisen with the CIA. As part of my representation I have participated in at least two classified meetings that I can recall with the CIA and Peter B. At one of those meetings the CIA (I believe the individual was from the Office of General Counsel) explicitly stated that Peter B. was a contractor and that the CIA possessed a specific document that Peter B. had signed that demonstrated this to be true. At the meeting Peter B. adamantly denied that he ever executed such a document, and he reiterated that he had served as a full staff employee of the CIA.

6.    Interestingly, notwithstanding the fact that I supposedly possess the requisite access (as the document was, as I recall, classified at the SECRET level), the CIA refused to allow me or even Peter B. to review the document. Indeed, the CIA refused to even allow us to solely examine the signature line at the bottom of the page so that we could at least confirm the authenticity. One cannot help but be suspicious of such conduct, and I actually stated this at the meeting. Given the extensive experience I have had representing CIA employees and dealing with its personnel, and the specific facts of this case, I can

only conclude the CIA is not being forthright in explaining the circumstances surrounding Peter B.'s status with the Agency and his termination.

7.   In all the years I have represented CIA employees who have faced termination of their employment I have never encountered a situation, notwithstanding what internal CIA regulations may permit with respect to discretionary authority, where that individual is not accorded some semblance of due process through a Personnel Evaluation Board (commonly referred to as a "PEB"). The individual is made aware of the allegations against them and provided an opportunity to respond, at least in writing. I find it extremely difficult to believe that the actions taken against Peter B. in this case are typical, and before the Court considers sanctioning such activity there should be some exploration as to personnel practices of the CIA to ensure Peter B. has not been singled out for an inappropriate, and perhaps unlawful, reason. In fact, defendant Margaret Peggy Lyons has been accused on several occasions – most recently in association with her husband Donald Keyser, who was sentenced to jail for providing classified information to unauthorized persons – of violating the law or security regulations. This has included, it is my understanding, an investigation by the CIA's Office of Inspector General in relation to the office where Peter B. used to work which she ran and involved a failure to account for tens of millions of dollars. Despite all the serious problems she has encountered Ms. Lyons apparently remains protected by the Agency.

8.   Peter B. has made me aware that the contractors with whom he attempted to, or did temporarily, secure employment with were invariably aware of his prior covert relationship with the CIA. This was particularly true because many of the individuals he was dealing with in the contract world were former CIA employees who had known him, or of him, while they were colleagues. It is quite common that defense contractors were previously employed by the very federal agency that they now do business with as a private individual.

3

9.   In his First Amended Complaint, Peter B. references, among other things, that the CIA failed to "transfer" his security clearances to contractors. By this it was meant that the CIA took steps to interfere with the normal process that would occur were it not inclined to seek to harm Peter B.'s employment prospects. Peter B. had been told repeatedly by CIA officials, claims which were also repeated to me, that no security issues existed. Had that been true Peter B.'s active clearances would have been "transferred" without delay or problem from the CIA to any particular defense contractor. Or, given Peter B.'s unique background and skills, even to the extent his clearances had "lapsed", as claimed by the CIA, it would have been well worth it, and within proper authority and a simple matter, for a contractor to sponsor him for a renewed clearance. However, I have come to witness in numerous cases I have handled representing former CIA employees who left the Agency's employ under "unfavorable" circumstances, such as with Peter B., that the CIA will play, for lack of a better term, "games" with the individual's clearances without ever denying or revoking them, both of which would require according the individual administrative remedies. Instead, the CIA apparently "whispers" to the contractor/prospective new employer that "something" negative exists within the file, or that the employee would *likely* be denied a clearance. In essence, if true, the CIA has discovered a method by which to deny individuals, many of whom happened to have past or ongoing disputes with the Agency, a security clearance without ever according them required due process. In the clearance world, an area in which I routinely handle cases (and have testified before Congress as an expert on multiple occasions), an unfavorable or derogatory inference regarding an individual's clearance, especially the potential inability to have one transferred, is often interpreted by contractors to impugn the person's moral character or reputation and they stay clear of the individual. It is my opinion that this type of situation is very likely responsible for what transpired to Peter B.

10. Finally, I am not aware of any employment lost by Peter B. that occurred because the contractor was unable to verify a prior covert relationship between the CIA and Peter

B. To the contrary, it would appear *something* specifically unfavorable or derogatory concerning Peter B. was said to the contractors by officials within CIA that led the contractors to rescind or fail to offer the offer of employment. Of course, it should come as no surprise that specifically *what* was said remains unavailable to Peter B. at this time absent the ability to conduct discovery.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date:   June 17, 2007

/s/

_____

Mark S. Zaid

# SECRECY/NONDISCLOSURE AGREEMENT

1. I hereby consent to the terms of this agreement in consideration of being granted access to certain official information that is classified or otherwise legally protected (hereinafter referred to as "National Security Information") in accordance with Executive Order 12958, as amended or superseded, and/or which is protected from disclosure pursuant to statutory authority. I understand that, by granting me access to National Security Information, the United States Government (USG) reposes special confidence and trust in me, and that I am obligated to protect this information from unauthorized disclosures.

2. In consideration of being provided National Security Information pursuant to this agreement, I agree that I will never divulge, publish, or reveal, either by work, conduct, or any other means, such information unless specifically authorized to do so by an appropriate official of the USG.

3. The provision of National Security Information pursuant to this agreement does not constitute any waiver by the USG of any statutory, evidentiary, common law, or other privilege.

4. I understand that my obligation not to further disclose National Security Information provided me pursuant to this agreement without USG approval will not prevent my representation of or the lawful enforcement of my client's rights. I agree, however, that before filing any court pleading or other documents on behalf of my client which may contain this National Security Information, I will notify the USG so that appropriate security protection can be sought by the USG prior to such filings being made.

5. These restrictions are consistent with, and do not supersede, conflict with, or otherwise alter the employee obligations rights or liabilities created by Executive Order 12958; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. section 421 et seq.) (governing disclosures that could expose confidential Government agents), and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive Order and listed statutes are incorporated into this Agreement and are controlling.

6. I understand that this agreement will remain binding upon me after the termination of my involvement with the USG.

_____          _____
DATE                                 SIGNATURE

                                     _____
                                     Printed Name

                                     _____
                                     SSN

                                     _____
                                     Address

_____          _____
DATE                                 WITNESS

                                     _____
                                     Printed Name of Witness

## ACKNOWLEDGMENT OF SECURITY REQUIREMENTS

My signature below serves to acknowledge that I will abide by the security requirements associated with my representing a Central Intelligence Agency-affiliated individual. These requirements are set forth in the Secrecy/Nondisclosure Agreement and the Security Guidance for Representatives. I was afforded a security briefing to discuss these requirements. During or prior to the briefing, among other things, I read and signed the Secrecy/Nondisclosure Agreement, read the Security Guidance for Representatives, and reviewed the provided Executive Order, federal statutes and regulations relating to the protection of classified information.

I have been provided an opportunity to ask questions about the information presented during the briefing, and I affirm that I understand the security requirements fully. **If you are retained to represent other Agency-affiliated personnel other than your present client, you will need to complete a separate Secrecy/Non-disclosure Agreement for each client.** I also understand that my failure to abide by these requirements may result in the revocation of my Secret clearance or additional administrative sanctions or criminal prosecution.

| | |
|---|---|
| _____ | By: _____ |
| Date | Signature |
| | _____ |
| | Printed Name |
| | _____ |
| | Address |
| _____ | _____ |
| Date | Signature of Witness |
| | _____ |
| | Printed Name of Witness |

2007 U.S. Dist. LEXIS 2708, *

**DOE (P), Plaintiff, v. Hon. PORTER GOSS, et al., Defendants.**

**Civil Action No. 04-2122 (GK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2007 U.S. Dist. LEXIS 2708**

**January 12, 2007, Decided**
**January 12, 2007, Filed**

**COUNSEL:** [*1] For (P) DOE, Plaintiff: Roy W. Krieger, LEAD ATTORNEY, Mark S. Zaid, KRIEGER & ZAID, PLLC, Washington, DC.

For PORTER GOSS, Honorable, Director, CENTRAL INTELLIGENCE AGENCY, Defendants: Marcia N. Tiersky, LEAD ATTORNEY, DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, DC.

**JUDGES:** Gladys Kessler, United States District Judge.

**OPINION BY:** Gladys Kessler

**OPINION**

*MEMORANDUM OPINION*

Plaintiff Doe, a former employee of the Central Intelligence Agency ("CIA"), brings this suit against Porter Goss, Director of the CIA; [1] the CIA; James Pavitt, CIA Deputy Director of Operations ("DDO"); the United States; and two Defendants Doe, whom Plaintiff identifies as current or former agents, officers and employees of the United States acting under color of Federal law. Plaintiff's true name and address are classified, and therefore he has been allowed to file as "Doe." Plaintiff brings this action under the Privacy Act, *5 U.S.C. § 552a(g)(1)*, the Administrative Procedure Act ("APA"), *5 U.S.C. §§ 706(1) & 2(A) - (D)*, the Little Tucker Act, *28 U.S.C. § 1346(a)(2)*, and the Federal Tort Claims Act ("FTCA"), *28 U.S.C. §§ 2671 et seq.* [*2]

---

1 The Director of the CIA is sued in his official capacity. Defendant Goss has since been succeeded by General Michael V. Hayden, although the Government has not formally moved to substitute him as a defendant.

This matter is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Mot."). Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, the Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

## I. BACKGROUND

### A. Factual History

2

---

2 For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *See Shear v. The National Rifle Association of America, 606 F.2d 1251, 1253 (D.C. Cir. 1979).* Therefore, the facts set forth herein are taken from Plaintiff's Second Amended Complaint or from the undisputed facts presented in the parties' briefs. Much of the Second Amended Complaint is classified and the CIA has redacted the text accordingly. The Court cites only to unredacted portions of the Second Amended Complaint.

[*3] The gravamen of Plaintiff's claims is that he "is being subjected to retaliation by Defendants for his refusal to falsify intelligence collected by him." Second Amended Complaint ("2AC") P 15.

Plaintiff joined the CIA as a contract covert Operations Officer in 1982, at which time he conducted covert operations against a variety of intelligence targets for the CIA Directorate of Operations ("CIA/DO"). [3] *Id.* at P 16. He alleges his service in this role resulted in his eventual approval for promotion to the rank of GS-15 and for receipt of the CIA Special Intelligence Medal. *Id.* He further alleges that he was advised by the CIA that his employment had been converted from that of a contractor to a staff employee, and that thereafter he began to receive regular GS promotions and bi-weekly payment stubs. *Id.* at P 17. In 1995, Plaintiff was assigned to the CIA/DO Counter Proliferation Division ("CPD"), where his mission was to collect intelligence on and interdict the proliferation of weapons of mass destruction ("WMD"). *Id.* at P 18.

---

3 As Defendants explain, "the Directorate of Operations is a component of the CIA responsible

for clandestine collection of foreign intelligence information." Defs.' Mot. at 4 n.3.

[*4]  Plaintiff alleges that, starting in 2000, he began to receive requests to change his reports or to refrain from reporting certain intelligence. *Id.* at P 21. After the first such instruction, he submitted a complaint via formal CIA "cable channels." CIA management subsequently advised him that his intelligence report did not support an earlier CIA assessment and told him that if he did not alter his report to support the earlier assessment it would not be received well by the intelligence community. *Id.* Plaintiff refused to alter his report, and the report was not disseminated. *Id.*

In 2001, Plaintiff met with a "highly respected human asset." [4] Immediately after the meeting Plaintiff reported certain classified information to his supervisor, who in turn met with CPD management. Plaintiff was later instructed to refrain from filing a written report. He was also told that the Deputy Director of Operations ("DDO") and CPD Chief would personally brief the President of the United States about the information conveyed by the "asset." Plaintiff claims no such briefing ever occurred. *Id.* at P 22.

> 4  As defined by Defendants, an "asset" is "a human intelligence source who provides information or assistance to the U.S. government, usually in secret, and often at great personal risk and in violation of the laws of nations other than the United States." Defs.' Mot. at n.4.

[*5]  Plaintiff alleges that the CIA "sequestered intelligence" in this manner on other occasions, as well. *Id.* at P 23.

At some point after the requests to alter his reporting began, a co-worker warned Plaintiff that CIA management planned to "get him" for his reporting of intelligence that was contrary to CIA "dogma." *Id.* at P 23. The CPD removed Plaintiff from "handling" at least one asset, and Defendant John Doe No. 1 advised him his promotion to GS-15 and receipt of the Special Intelligence Medal were being withheld until he removed himself from further handling of assets. *Id.* at PP 22, 24.

In 2003, Plaintiff learned that the CIA had initiated a counter-intelligence ("CI") investigation into allegations that Plaintiff had had sex with a female asset. Five days after beginning a new position at the CIA, he learned that the position was cancelled due to pressure from Defendant Pavitt. *Id.* at P 26. In September 2003, the Chief of the CIA Counter Intelligence Center ("CIC") placed Plaintiff on paid administrative leave without explanation, and Defendant Pavitt withheld from Plaintiff the previously approved promotion to GS-15 and the Medal of Intelligence. *Id.* at [*6]  P 27-28.

Around May 2004, the CIA Office of Inspector General ("OIG") informed Plaintiff that Defendants Pavitt and John Does Nos. 1 & 2 reported that Plaintiff had diverted to his own use money provided to him for payment to human assets. The OIG advised Plaintiff it was investigating these claims. *Id.* at P 29.

During the week of July 26, 2004, Plaintiff met with OIG investigators who requested explanations for a list of financial items, including one check for $ 30.00 that predated the CI investigation. Plaintiff explained all of the deposits. *Id.* at P 30. The OIG again interviewed Plaintiff on December 8, 2004 regarding the alleged diversion of funds. On April 19, 2005, Plaintiff received final notification that the OIG investigation was terminated. [5] *Id.* at P 36. There was no finding of wrongdoing by Plaintiff. *Id.*

> 5  The Second Amended Complaint contains no pleadings regarding the conclusion of the CI investigation.

On August 6, 2004, while the OIG investigation was ongoing, the CIA [*7]  notified Plaintiff that effective September 10, 2004 he would be terminated for unspecified reasons. The letter characterized Plaintiff's position as one of a contractor, and Plaintiff did not receive the administrative process afforded to CIA employees prior to termination. *Id.* at P 31.

Plaintiff alleges the CI and OIG investigations were a sham undertaken to discredit him in retaliation for his refusal to falsify his reports. *Id.* at PP 32-33. He alleges the information collected about him is contained in a system of records retrievable by his name or other identifier, and that these records provided Defendants the necessary pretext to terminate him. *Id.* at P 34. Plaintiff claims material inaccuracies exist in a number of these records, including his Official Personnel File, Counter-Intelligence Center file, Office of Medical Services file, and his Center for CIA Security file. *Id.* at P 37.

**B. Procedural History**

Plaintiff filed the instant action on December 6, 2004. On April 27, 2005, he filed an amended complaint; on November 15, 2005, he filed a Second Amended Complaint with leave of the Court. The Second Amended Complaint alleges violation of the APA, [*8]  *5 U.S.C. §§ 706(1) & (2)(A) - (D)*; violation of the Privacy Act, *5 U.S.C. §§ 552a(e)(2) & (5)*; breach of contract pursuant to the Little Tucker Act, *28 U.S.C. § 1346(a)(2)*; "failure to convert Plaintiff to staff employee"; "tortious violation of Plaintiffs' [sic] rights under the U.S. Constitution and amendments thereto" [6]; and violation of the Federal Tort Claims Act ("FTCA"). Plaintiff seeks injunctive relief to reinstate his CIA em-

ployment at the GS-15 staff level and to order the CIA Director to undertake rule-making to promulgate regulations to ensure protection of Plaintiff's rights relating to his CIA employment; restitution of back pay; compensatory damages and attorneys' fees as a result of the foregoing.

> 6    Defendants contend that individual Defendants James Pavitt, John Doe 1 and John Doe 2 have not yet been served with the Second Amended Complaint, and thus are not presently represented by the Government Defendants' counsel. Therefore, the Motion to Dismiss does not address the *Bivens* claim against the individual Defendants.

[*9]  Defendants filed the present Motion to Dismiss the Second Amended Complaint on December 19, 2005 [Dkt. No. 31], which Plaintiff opposed on March 9, 2006 [Dkt. No. 37] ("Pl.'s Opp'n"). Defendants filed a Reply on April 3, 2006 [Dkt. No. 41] ("Defs.' Reply").

## II. STANDARD OF REVIEW

A motion to dismiss should only be granted "when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).* Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." *Haynesworth v. Miller, 261 U.S. App. D.C. 66, 820 F.2d 1245, 1254 (D.C. Cir. 1987).* Accordingly, the factual allegations of the Complaint must be presumed true and liberally construed in favor of Plaintiff. *Shear, 606 F.2d at 1253.*

Likewise, in considering a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true all material factual allegations [*10]  in the complaint. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Walker v. Jones, 236 U.S. App. D.C. 92, 733 F.2d 923, 925-26 (D.C. Cir. 1984).* The plaintiff bears the burden of establishing that the court has jurisdiction. *District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428, 431 (D.D.C. 1987),* citing *KVOS, Inc. v. Associated Press, 299 U.S. 269, 57 S. Ct. 197, 81 L. Ed. 183 (1936).*

## III. ANALYSIS

**A. The Civil Service Reform Act Precludes Plaintiff's APA (Count I), Contract (Count III), and FTCA (Count VI) Claims; It Does Not Preclude Plaintiff's Privacy Act Claim (Count II)**

As a threshold matter, Defendants contest this Court's subject matter jurisdiction over Plaintiff's APA, Privacy Act, FTCA and contract claims. They argue that the Civil Service Reform Act ("CSRA") deprives the Court of jurisdiction over these claims because they constitute challenges to personnel decisions, which may only be reviewed pursuant to that statute's remedial scheme.

### 1. CSRA Background

The CSRA, enacted in 1978, established an elaborate new framework for evaluating adverse personnel actions [*11]  against certain categories of federal employees. The Supreme Court described this framework as "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto, 484 U.S. 439, 445, 108 S. Ct. 668, 98 L. Ed. 2d 830 (1988).* It creates procedures for administrative and judicial review of personnel actions for covered employees. The CSRA provides procedural protections for three general types of personnel actions: "personnel actions," such as appointments, promotions, disciplinary actions, and decisions concerning pay, benefits or awards, *5 U.S.C. § 2302;* removals and reductions in grade and pay based on unacceptable performance, *5 U.S.C. § 4303;* and "adverse personnel actions" taken to "promote the efficiency of the service" (i.e. involving employee misconduct), such as removals, suspensions, and reductions in grade or pay. *5 U.S.C. §§ 7503, 7513.*

Chapter 23 of the CSRA, which establishes the principles of the merit system of employment,  [*12]  "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers." *Fausto, 484 U.S. at 446 (citing 5 U.S.C. § 2302).* Chapter 23 applies to prohibited personnel practices by agency employees with "authority to take, direct others to take, recommend, or approve any personnel action." *5 U.S.C. § 2302(b).* "Personnel action" is defined to include appointments, promotions, disciplinary actions, and decisions concerning pay, benefits or awards, among other actions. *5 U.S.C. § 2302(a)(2)(A).* Employees covered by this chapter are given the right to file charges of prohibited personnel practices with the Office of Special Counsel of the Merit Systems Protection Board ("MSPB"), whose responsibility it is to investigate the charges and, where appropriate, to seek remedial action from the agency and the MSPB. *5 U.S.C. § 1204.*

Chapter 75 of the CSRA governs adverse actions taken against employees for the "efficiency of the service." Subchapter II, the subchapter [*13]  relevant to this case, governs major adverse actions taken against covered employees; they are defined as removals, sus-

pensions for more than 14 days, reductions in grade or pay, or furloughs for 30 days or less. *5 U.S.C. §§ 7511-7514.* In each subchapter, covered employees are given certain procedural protections. In Subchapter II, all employees covered by the statute are accorded administrative review by the MSPB, followed by judicial review in the Federal Circuit. *5 U.S.C. §§ 7513(d), 7703.*

It is well-established that the CSRA preempts many other remedies federal civil service employees had prior to its enactment. In *Bush v. Lucas, 462 U.S. 367, 373, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983),* the Supreme Court held that the CSRA precluded an employee's *Bivens* action, even though the CSRA remedial mechanisms were less complete than the damages remedy provided in *Bivens.* The Supreme Court reasoned that it would be inappropriate to supplement the CSRA's "elaborate remedial system" with new judicial remedies for claims "aris[ing] out of an employment relationship." *Id. at 368, 388.* [*14] The Court expressly declined to consider whether judicial remedies would be available "in the absence of any other remedy to vindicate the underlying right." *Id. at 378 n.14.*

The Supreme Court addressed precisely that question in *Fausto,* where a federal employee sought judicial review of his removal from government service under the Back Pay Act, *5 U.S.C. § 5596,* on the ground that his dismissal violated regulations issued by his employing agency. *Id. at 441-43 & n.2.* The employee's classification gave him no right to administrative or judicial review under the CSRA. The Supreme Court held that the comprehensive framework of the CSRA nevertheless precluded judicial review under the Back Pay Act:

> The CSRA established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review ... under the Back Pay Act.

*Id. at 455.*

The Court reasoned that [*15] allowing direct judicial review of employment claims for employees with no rights under the CSRA would provide them a more substantial right to review than was available to employees granted a right to judicial review under the CSRA. Employees granted a right to judicial review under the CSRA are required to first seek administrative review by the MSPB before proceeding to judicial review in the Federal Circuit. *See id. at 448-50.*

The Supreme Court also concluded that when Congress established the elaborate CSRA remedial system, it intended to streamline the procedures available for review of federal employees' personnel actions. Direct judicial review for non-covered employees would undermine "the development, through the MSPB, of a unitary and consistent Executive Branch position on matters involving personnel action," and would frustrate the congressional intent to "avoid[] an unnecessary layer of judicial review in lower federal courts." *Id. at 449* (internal quotation omitted).

The Court found that the CSRA was intended to displace the alternative avenues for review available at that time. *Id. at 454-55.* Given the comprehensiveness [*16] of the CSRA scheme, the Court concluded that Congress' exclusion of employees in the *Fausto* plaintiff's service category from the provisions establishing administrative and judicial review was intentional and deliberate. *Id. at 455.* In particular, the Court held that exclusion of a class of employees from the protections of the CSRA does not leave those employees "free to pursue whatever judicial remedies [they] would have had before enactment of the CSRA." *Id. at 447.* Rather, such exclusion evinced a "clear congressional intent to deny the excluded employees the protections of Chapter 75 - including judicial review-for personnel action covered by that chapter." *Id. at 447.* Thus, the Court ruled that by expressly excluding members of the *Fausto* plaintiff's classification from the CSRA's remedial system, Congress intended to prevent them from seeking judicial review under the Back Pay Act. *Id.*

The CSRA expressly excludes CIA employees from the classes of employees for whom the CSRA's review procedures are available. *5 U.S.C. §§ 2302(a)(2)(A), 7511(b)(7).* Defendants, citing [*17] *Fausto,* argue that this exclusion not only prevents Plaintiff from pursuing the remedies provided under the CSRA, but also from pursuing all remedies otherwise available for personnel actions covered by the CSRA. Defendants contend that because Plaintiff's APA, Privacy Act, contract, and FTCA claims challenge such "personnel actions," they are preempted by the CSRA under *Fausto.*

## 2. The CSRA Precludes Plaintiff's APA Claim (Count I) Because It Seeks Judicial Review of Adverse Personnel Actions

Plaintiff brings Count I of the Second Amended Complaint pursuant to the APA, *5 U.S.C. §§ 706(1) & (2)(A)-(D).* [7] He alleges that Defendants violated the APA through their violation of "portions of CIA regulations providing for the integrity of intelligence collection

and reporting." 2AC P 39. He seeks reinstatement at the GS-15 staff level "to which his promotion was wrongfully withheld," as well as restitution of pay at that salary level. *Id.* at P 41. He also asks the Court to order the CIA "to undertake rule-making to promulgate appropriate regulations to ensure protection of Plaintiff's rights in matters concerning ... his employment at CIA."  [*18] *Id.* at P 42.

7    Administrative Procedure Act *5 U.S.C. § 706* provides:

>    To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -

>    (1) compel agency action unlawfully withheld or unreasonably delayed; and

>    (2) hold unlawful and set aside agency action, findings, and conclusions found to be -

>    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>    (B) contrary to constitutional right, power, privilege, or immunity;

>    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>    (D) without observance of procedure required by law;

>    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

[*19] Plaintiff's APA claim seeks judicial review of the CIA's decision to deny him a promotion and to terminate him. [8] Defendants contend that these claims are precluded by the CSRA. [9] Defs.' Mot. at 25 n.20. Significantly, Plaintiff's Opposition does not even address Defendants' preclusion argument. Accordingly, Plaintiff may be deemed to have conceded the Motion to Dismiss as to Count II. LCvR 7(b); *see United States v. Real Property Identified As: Parcel 03179-005R, 287 F. Supp. 2d 45, 61 (D.D.C. 2003)* ("If the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded.") (internal citation omitted). Because the decision to deem an argument as conceded for a party's failure to respond is discretionary, and because Defendants' argument challenges subject matter jurisdiction, the Court will consider, on the merits, whether the APA claim is precluded by the CSRA.

>    8    To the extent Plaintiff claims that the CIA violated its own regulations governing investigation of complaints, resulting in injury to Plaintiff's reputation, he must pursue this claim pursuant to the Privacy Act. "[W]here the Congress has provided special and adequate review procedures," *APA Section 704* does not provide additional judicial remedies. *Bowen v. Massachusetts, 487 U.S. 879, 903, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988)*; *see also 5 U.S.C. § 704* ("Agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added). The Privacy Act provides for the review of claims of reputational harm. Accordingly, Plaintiff cannot also pursue this claim pursuant to the APA.

[*20]

>    9    Defendants also contend that Plaintiff insufficiently alleges what regulations were violated, lacks standing to bring his APA claim, and is not entitled to the relief he seeks. Defs.' Mot. at 18-28; Defs.' Reply at 10-15. Because the Court concludes that it has no jurisdiction over Plaintiff's APA claim, there is no need to address those arguments.

Our Court of Appeals has concluded that the CSRA eliminates the right to judicial review under the APA for adverse actions that fall within the CSRA's scope. If the courts were to review such actions, "the exhaustive remedial scheme of the CSRA would be impermissibly

frustrated." *Carducci v. Regan*, 230 U.S. App. D.C. 80, 714 F.2d 171, 174 (D.C. Cir. 1983); *see also Harrison v. Bowen*, 259 U.S. App. D.C. 304, 815 F.2d 1505, 1513 (D.C. Cir. 1987) (the CSRA "had the effect of depriving employees of a right of judicial review under the APA that they probably had prior to enactment of the CSRA.").

The CSRA precludes APA actions challenging personnel decisions, including those concerning promotions and awards, *5 U.S.C. § 2302(a)(2)(A)(ii)* [*21] *& (ix)*, as well as those challenging adverse actions, including terminations, *5 U.S.C. § 7512(1)*. *See Graham v. Dep't of Justice*, No. 02-1231, 2002 U.S. Dist. LEXIS 27419, at *6-8 (D.D.C. Nov. 20, 2002), *aff'd sub nom. Graham v. Ashcroft*, 03-5025, 2003 U.S. App. LEXIS 16108 (D.C. Cir. Aug. 5, 2003). The CSRA also precludes claims that, in taking a particular adverse personnel action, an agency violated its own regulations. *Graham v. Ashcroft*, 360 U.S. App. D.C. 124, 358 F.3d 931, 935-36 (D.C. Cir. 2004). These are precisely the types of actions Plaintiff challenges in his APA claim.

In an attempt to circumvent the CSRA, Plaintiff argues in his Opposition that he has alleged a violation of constitutional rights actionable under *§ 706(2)(B)*. Pl.'s Opp'n at 16. He points to his *Bivens* claim (Count V) in support of this argument. *Id.*

It is true that our Court of Appeals has held that federal employees may "seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights"; the CSRA does not preclude such claims. *Spagnola v. Mathis*, 273 U.S. App. D.C. 247, 859 F.2d 223, 229-30 (D.C. Cir. 1988) [*22] (en banc) (*rev'd in part on other grounds by Hubbard v. EPA, 299 U.S. App. D.C. 143, 982 F.2d 531 (D.C. Cir. 1992)*). However, despite two amendments to his original Complaint, Plaintiff's final Second Amended Complaint still does not allege in his APA claim a violation of a constitutional right. He alleges only that "[t]he complained of acts and omissions by Defendants Goss [sic] have violated [classified] *portions of CIA regulations* providing for the integrity of intelligence collection and reporting, in violation of *5 U.S.C. §§ 706(1) & (2)(A) - (D)*." 2AC P 39 (emphasis added). [10] Alleged violation of agency regulations cannot be reviewed under *Graham. 358 F.3d at 935-36*.

10 Plaintiff argues in his Opposition that his allegations "can also be fairly read at this stage to implicate violations of the National Security Act of 1947, as amended, as well as procedural violations, actionable under *§§ 706(2)(C) & (D)*." Pl.'s Opp'n at 16. Plaintiff's Second Amended Complaint contains no such allegations. Moreover, to the extent Plaintiff purports to challenge his ter-

mination under *§ 102(c)* of the National Security Act, the Supreme Court has held that *APA § 701(a)(2)* precludes judicial review of terminations under *§ 102(c)* because the decision to terminate a CIA employee is committed to agency discretion by law. *Webster v. Doe*, 486 U.S. 592, 601, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988).

[*23] For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's APA claim (Count I) is granted.

### 3. The CSRA Does Not Preclude Plaintiff's Privacy Act Claim (Count II) Because Plaintiff Has Alleged that the Violations Actually Caused His Injury

In Count II, Plaintiff alleges Defendants violated the Privacy Act, which "regulates the collection, maintenance, use, and dissemination of information concerning individuals." *Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001). Plaintiff argues that during the CIA's investigation of his alleged sexual affair and diversion of funds, the agency willfully and intentionally created and relied upon inaccurate records in violation of the Privacy Act and that these violations resulted in irreparable damage to his career. He claims that these records caused him injury, including his termination and "adverse determinations about the rights, benefits and privileges of Plaintiff under Federal Programs." 2AC P 46.

Specifically, Plaintiff alleges violation of two provisions of the Privacy Act. First, he alleges that Defendant CIA "wilfully and intentionally failed to maintain accurate, timely and complete records" about [*24] him in violation of *5 U.S.C. § 552a(e)(5)* ("Accuracy claim"). 2AC P 44. As a result of this violation, Plaintiff [11] alleges that he suffered the following adverse determinations: he was placed on administrative leave, barred from entering CIA facilities or engaging in any further operations on behalf of the CIA, denied his "previously approved promotion to GS-15" and the CIA Medal of Intelligence, terminated from his employment, and denied the process to which he would have been entitled as a GS staff employee to contest his termination. [12]

11 *5 U.S.C. § 552a(e)(5)* provides:

Each agency that maintains a system of records shall ? maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination.

2007 U.S. Dist. LEXIS 2708, *

12   In his allegation of injury, Plaintiff refers back to PP 22-29 of the Complaint. 2AC P 44. Because the paragraph numbers of this claim were not changed in Plaintiff's Second Amended Complaint, the Court will liberally construe the cross-referenced paragraphs to which the alleged injury refers to encompass Paragraphs 22-35 of the Second Amended Complaint.

[*25] Second, he alleges that Defendant CIA violated *5 U.S.C. § 552a(e)(2)* [13] by "wilfully and intentionally fail[ing] to the greatest extent practicable to collect directly from Plaintiff information that would have refuted the allegations against him" ("Information-Gathering claim"). 2AC P46. Plaintiff alleges that this violation "resulted in adverse determinations about [his] rights, benefits and privileges ... under Federal Programs...." *Id.* For each of these violations, he seeks actual damages and all relief to which he is entitled under the Privacy Act. 2AC PP 48-49. [14]

13   *5 U.S.C. § 552a(e)(2)* provides:

Each agency that maintains a system of records shall ... collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs.

14   In his Opposition, Plaintiff contends for the first time that he has "an equitable right to challenge the offending records" and seek expungement. Pl.'s Opp'n at 13-14. To the extent Plaintiff is asserting this "equitable right" as a constitutional claim rather than as a statutory claim, the case law is clear that "when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." *Steadman v. Governor, United States Soldiers' & Airmen's Home, 287 U.S. App. D.C. 23, 918 F.2d 963, 967 (D.C. Cir. 1990).* He has not done so here. As Defendants correctly point out, Plaintiff has failed to plead that he sought expungement pursuant to the amendment provisions of *5 U.S.C. § 552a(d)(2) & (3)* administratively before seeking judicial review. Defs.'

Reply at 9 n.7. *See 5 U.S.C. § 552a(d)*; *Dickson v. Office of Personnel Mgt., 264 U.S. App. D.C. 182, 828 F.2d 32, 40-41 (D.C. Cir. 1987).* Accordingly, he has failed to plead exhaustion of his administrative remedies as to this claim. Plaintiff cannot circumvent the exhaustion requirement by styling his "equitable right" as a constitutional claim where, as here, Congress has provided administrative machinery for the resolution of the statutory claim. Because he has not alleged exhaustion of available administrative remedies, this Court has no authority to consider Plaintiff's alleged equitable right to challenge the records.

[*26] In assessing whether the CSRA precludes these claims, the determinative question is whether they fall within its purview. *See, e.g., National Treasury Employees Union v. Devine, 577 F. Supp. 738, 745 (D.D.C. 1983), aff'd 236 U.S. App. D.C. 22, 733 F.2d 114 (D.C. Cir. 1984).* As discussed above, this statutory framework covers "personnel actions," including promotions, benefits and awards, as well as adverse actions, including terminations. *See 5 U.S.C. §§ 2302(a)(2)(A)(ii) & (ix), 7512(1).* Where a plaintiff's Privacy Act claim in substance seeks judicial review of such a federal personnel action, as Defendants argue here, the CSRA precludes that claim regardless of how Plaintiff seeks to characterize it. *See Kleiman v. Dep't of Energy, 294 U.S. App. D.C. 49, 956 F.2d 335, 338 (D.C. Cir. 1992).*

Plaintiff argues that his Privacy Act claims are outside the CSRA scheme and therefore not precluded by it. He contends that these claims do not arise out of one of the prohibited personnel actions specifically enumerated by the CSRA, but rather arise out of the recording of inaccurate information during the [*27] course of the two "sham investigations" that discredited him. Pl.'s Opp'n at 12-13. Moreover, Plaintiff argues that because his injuries were actually caused by this inaccurate information, his claims are not precluded by the CSRA. Pl.'s Opp'n at 13.

A Privacy Act claim survives CSRA preclusion in this jurisdiction if a plaintiff shows the harm alleged was *actually caused* by the alleged violation. In *Hubbard v. EPA, 257 U.S. App. D.C. 305, 809 F.2d 1, 5 (D.C. Cir. 1986) aff'd in part on other grounds sub nom. Spagnola v. Mathis, 273 U.S. App. D.C. 247, 859 F.2d 223 (D.C. Cir. 1988)* (en banc), our Court of Appeals explained that while the CSRA preempts judicial review of prohibited personnel actions, the District Courts retain jurisdiction to award damages "for an adverse personnel action actually caused by an inaccurate or incomplete record." *See also, Kleiman, 956 F.2d at 339 n.5* (reaffirming *Hubbard's* statement that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action actually caused by an inaccurate or incomplete

record"). The question before this Court, then, is whether Plaintiff has sufficiently [*28] alleged that the adverse actions were caused by the inaccurate records.

In their argument on the merits, Defendants contend that Plaintiff has not properly alleged causation in either his Accuracy or Information-Gathering claims. Rather, they argue he has specifically alleged that his termination was in retaliation for his failure to falsify his intelligence reporting. Accordingly, Defendants argue, the two investigations that are the subject of Plaintiff's Privacy Act claims cannot also be the cause of his termination for purposes of the Privacy Act. Defs.' Mot. at 13-15.

With respect to his Accuracy claim, Plaintiff counters that the announced basis for his termination was the false information contained in the identified files. He contends that the CIA initiated two investigations, and that the inaccurate information recorded during those investigations proximately caused the CIA to order his termination.

The fact that Plaintiff also claims that the investigations themselves were pretextual does not preclude his causation argument. See Pl.'s Opp'n at 9-11. Under *Federal Rule of Civil Procedure 8(e)(2)*, a plaintiff may plead inconsistent [*29] facts in support of alternative theories of recovery. At this stage in the proceedings, Plaintiff may argue that the investigations were a pretext used to terminate him for refusing to falsify his reports and at the same time argue that the investigations actually caused his termination. Discovery may show that Plaintiff was, in fact, terminated due to the allegedly false information in his records collected as part of the CI and OIG investigations. [15]

> [15] There is no dispute that the OIG investigation was concluded with no finding of wrongdoing on Plaintiff's behalf, that the CIA sought information from Plaintiff in July 2004, or that the investigation did not conclude until April 2005, after Plaintiff's termination. See 2AC PP 30, 36; Defs.' Reply at 5. This timing does not necessitate a finding against causation, however. The extent to which various pieces of information collected during the course of the investigation itself affected the adverse actions in this case is an issue of fact that cannot be resolved at this stage.

[*30] Moreover, in *Krieger v. Fadely, 341 U.S. App. D.C. 163, 211 F.3d 134, 136 (D.C. Cir. 2000)*, the Court of Appeals recognized that at the initial pleading stage, very little is required to survive a motion to dismiss for failure to state a claim. That principle is particularly relevant here where Plaintiff does not even know the precise contents of his records because they are classified and he has no access to them. Thus, his allegation

is plausible that these records contain derogatory information that formed the pretext for his termination. For example, he knows that the CIA initiated two investigations and he knows he was subsequently fired. It is not unreasonable to conclude, as Plaintiff has alleged, that information recorded in his files as a result of the investigations was the cause of his termination. Reading the Complaint in the light most favorable to Plaintiff, he has alleged actual causation in his Accuracy claim. Accordingly, that claim is not precluded by the CSRA.

With respect to his Information-Gathering claim, Plaintiff has alleged that Defendants' failure to seek information from him in the course of the CI investigation, and the failure to seek [*31] information at an earlier point in the OIG investigation, proximately caused adverse determinations about his rights and benefits under federal programs. It is true that Plaintiff does not provide much detail regarding the determinations about his rights and benefits or about the role of the CI and OIG investigation reports in those determinations. However, "complaints 'need not plead law or match facts to every element of a legal theory.'" *Krieger, 211 F.3d at 136* (internal citation omitted).

Moreover, the Court at this early stage must give Plaintiff "the benefit of all inferences that plausibly can be drawn from well-pleaded allegations of the complaint," *Haynesworth, 820 F.2d at 1254*. It is certainly plausible to infer from Plaintiff's allegations that, had Defendants consulted with him regarding the CI investigation, the allegedly false information would not have been recorded in Plaintiff's files. Similarly, the Court may plausibly infer that, had Defendants consulted with Plaintiff at an earlier point in the OIG investigation, certain false or inaccurate information would not have been recorded in Plaintiff's files.

Because Plaintiff has alleged [*32] that Defendants Privacy Act violation actually caused his injury, the Information-Gathering claim is not precluded by the CSRA.

**4. The CSRA Precludes Plaintiff's Contract Claim (Count III) Because It Seeks Judicial Review of Adverse Personnel Actions**

In Count III of the Second Amended Complaint, Plaintiff alleges that "Defendants have acted in a wrongful and illegal manner in terminating [Plaintiff's contract of employment], as the result of which Plaintiff has suffered damages." 2AC P 51. He contends that "Defendants' complained of actions constitute breach of Plaintiff's contract of employment, including the implied covenant of good faith and fair dealing." *Id.* Defendants argue that Plaintiff was properly terminated as a contract

employee, and that his contract claim is an improper attempt to circumvent the CSRA.

Plaintiff's contract claim challenges his termination. This is a quintessential adverse personnel action covered by the CSRA. As with Plaintiff's APA claim, the Court has no jurisdiction to consider a breach of contract claim arising out of a personnel action. *See Bobula v. United States Dep't of Justice, 970 F.2d 854, 857-58 (Fed. Cir. 1992).* [*33] [16] For these reasons, Plaintiff's contract claim is dismissed.

> 16   Plaintiff brings his breach of contract claim pursuant to the Little Tucker Act, which waives sovereign immunity for certain types of damage claims, including "any express or implied contract with the United States," not exceeding $10,000. *28 U.S.C. § 1346(a)(2).* As Defendants point out, while this Court may hear claims under the Little Tucker Act, such claims may only be appealed to the Federal Circuit. *See 28 U.S.C. § 1295(a)(2); Kline v. Cisneros, 316 U.S. App. D.C. 183, 76 F.3d 1236 (D.C. Cir. 1996).* As such, Federal Circuit precedent regarding the Little Tucker Act is binding on this Court.

**5. The CSRA Precludes Plaintiff's Federal Tort Claims Act Claim (Count VI) Because It Seeks Judicial Review of Adverse Personnel Actions**

Plaintiff's FTCA claim against "Defendant United States" alleges that Defendant "negligently failed to convert Plaintiff's employment status [*34] from that of a contractor to that of a staff employee of CIA...." 2AC P 61. He claims Defendants breached a "duty to properly administer and manage his personnel records," Pl.'s Opp'n at 26, which resulted in the failure to process his alleged promotion. His allegations amount to a complaint of negligence for failure to promote him to an agency employee position.

The promotion of a federal employee falls squarely within the CSRA's definition of "personnel action." *5 U.S.C. § 2302(a)(2)(A)(ii).* As discussed above, the case law is clear that Congress intended to preclude non-CSRA remedies for such actions, even where the CSRA does not make those remedies available to the plaintiff. Our Court of Appeals has held that this preclusion applies to federal employees' FTCA claims. *See Am. Postal Workers Union, AFL-CIO v. United States Postal Serv., 291 U.S. App. D.C. 273, 940 F.2d 704, 708-09 (D.C. Cir. 1991)* (holding that the CSRA preempted FTCA claim even where plaintiffs did not have access to remedies provided to other classes of employees under the CSRA). [17]

> 17   Plaintiff failed to respond to Defendants' argument that the FTCA claim is precluded by the CSRA. Consequently, as noted earlier, this Court may deem that argument conceded. LCvR 7(b); *see Real Property Identified As: Parcel 03179-005R, 287 F. Supp. 2d at 61.*

[*35] For these reasons, Plaintiff's FTCA claim is dismissed.

**B. Defendants' Motion to Dismiss the Privacy Act Claim (Count II) Is Denied Because Plaintiff Has Sufficiently Pled Each Element of His Accuracy Claim and His Information-Gathering Claim**

**1. Plaintiff Has Sufficiently Pled the Elements of His Accuracy Claim**

The Privacy Act requires that each agency that keeps a system of records must maintain those records "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary" to assure fairness to an individual. *5 U.S.C. § 552a(e)(5). See Sellers v. Bureau of Prisons, 294 U.S. App. D.C. 361, 959 F.2d 307, 312 (D.C. Cir. 1992)* ("As long as the information contained in an agency's files is capable of being verified, then, under sections *(e)(5)* and *(g)(1)(C)* of the Act, the agency must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual.").

To make out a claim for money damages under this section of the Privacy Act, a plaintiff must demonstrate that (1) he has been [18] aggrieved by an adverse determination, (2) the CIA has failed to maintain his records [*36] with the degree of accuracy necessary to assure fairness in that determination, (3) the CIA's reliance on the inaccurate records was the proximate cause of the adverse determination, and (4) the CIA acted willfully and intentionally in failing to maintain accurate records. *See Deters v. U.S. Parole Comm'n, 318 U.S. App. D.C. 89, 85 F.3d 655, 657 (D.C. Cir. 1996).*

> 18   Plaintiff states in his Opposition that he seeks to clear his reputation through his Privacy Act claim. Pl.'s Opp'n at 12 n.13. To the extent that by this argument Plaintiff means he seeks the remedy of expungement, he has no such remedy through his Privacy Act claim because he has not alleged exhaustion of his administrative remedies. *See supra* Section III.A.3. n.14; *M.K. v. Tenet, 99 F. Supp. 2d 12 (D.D.C. 2000)* (*citing Nagel v. U.S. Department of Health, Education and Welfare, 233 U.S. App. D.C. 332, 725 F.2d 1438, 1441 (D.C. Cir. 1984)*).

If an agency willfully or intentionally fails to [*37] maintain records in such a manner and, as a result, makes

a determination adverse to an individual, it will be liable to that person for money damages. *5 U.S.C. §§ 552a(g)(1)(C) & (g)(4). See Sellers, 959 F.2d at 312.* An agency acts in an intentional or willful manner "either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act. The violation must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Deters v. U.S. Parole Comm'n, 318 U.S. App. D.C. 89, 85 F.3d 655, 660 (D.C. Cir. 1996)* (internal citations omitted); *see Tijerina v. Walters, 261 U.S. App. D.C. 301, 821 F.2d 789, 799 (D.C. Cir. 1987)* (agency must act "with something greater than gross negligence").

In addition to their challenge to Plaintiff's allegations of causation, which the Court addressed in the context of the CSRA, *supra*, [19] Defendants raise two further arguments against Plaintiff's Accuracy claim.

> 19    The discussion of CSRA preclusion addressed this same causation question raised on the merits of the Privacy Act claim -- whether Plaintiff has sufficiently alleged that his injury was actually caused by the Privacy Act violations. As discussed *supra*, Plaintiff's causation allegations are sufficient to survive a motion to dismiss.

[*38] First, Defendants contend that Plaintiff has not adequately identified the records he alleges are inaccurate. Defs.' Mot. at 6-8. Plaintiff responds that he has identified particular files containing inaccurate records, which he contends is adequate to put Defendants on notice as to his Accuracy claim.

The Federal Rules of Civil Procedure require that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." *Fed. R. Civ. P. 8(a)(2).* The complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).*

In the Second Amended Complaint, Plaintiff alleges that "intentional, material inaccuracies exist in his Official Personnel File, Counter-Intelligence [sic] Center file, Office of Medical Services file, Center for CIA Security file, and other CIA files." 2AC P 37. His pleadings clearly allege that the inaccuracies relate to the OIG and CI investigations: [*39] "[T]he information about him gathered during the course of the CI and OIG investigations is contained in records stored in a system of records, retrievable by his name or other identifier." *Id.* at P 34.

Thus, it is clear that Plaintiff has identified the files containing the inaccurate records, as well as the general subject matter of the records. These allegations are sufficient to withstand a motion to dismiss. *See Krieger, 211 F.3d at 136* ("If his lawsuit went forward, there would come a time when [the plaintiff] would have to identify the particular records [the defendant] unlawfully disclosed [under the Privacy Act]. But that point surely was not as early as the pleading stage."); *M.K., 99 F. Supp. 2d at 21-22.*

Second, Defendants argue that Plaintiff "has failed to adequately allege wilfulness or intentionality, as required by the Privacy Act." Defs.' Reply at 4-5. Because Plaintiff's allegations merely parrot the language of the Privacy Act, Defendants contend, they are conclusory and cannot withstand a motion to dismiss. *Id.* Plaintiff counters that the allegations in the Second Amended Complaint sufficiently plead willful [*40] or intentional conduct.

In the Second Amended Complaint, Plaintiff alleges that the CIA initiated two sham investigations "for the sole purpose of discrediting him and retaliating against him" for refusing to falsify his intelligence reporting. 2AC P 33. He alleges that the information gathered during the course of these investigations is contained in the files he identifies. *Id.* at P 34. If proven, Defendants' calculated recording of false information pursuant to these allegedly sham investigations would certainly meet *Deters* ' definition of a willful or intentional conduct. *See Toolasprashad v. Bureau of Prisons, 351 U.S. App. D.C. 64, 286 F.3d 576, 583-84 (D.C. Cir. 2002)* (finding the defendants acted willfully or intentionally when they "fabricated and falsified" a transfer memorandum to punish the plaintiff for, among other things, filing administrative grievances).

For these reasons, Defendants' Motion to Dismiss is denied with respect to Plaintiff's Accuracy claim.

## 2. Plaintiff Has Sufficiently Pled the Elements of His Information-Gathering Claim

In his Information-Gathering claim, Plaintiff alleges that Defendant CIA violated [*41] *5 U.S.C. § 552a(e)(2)* by "wilfully and intentionally fail[ing] to the greatest extent practicable to collect directly from Plaintiff information that would have refuted the allegations against him." 2AC P 46. A plaintiff seeking relief under *subsection (e)(2)* of the Privacy Act must show that (1) the agency failed to elicit information directly from him to "the greatest extent practicable," (2) the violation was "intentional or willful," and (3) this action had an adverse effect on the plaintiff. *Waters v. Thornburgh, 281 U.S. App. D.C. 173, 888 F.2d 870, 872 (D.C. Cir. 1989), ab-*

*rogated on other grounds by Doe v. Chao, 540 U.S. 614, 124 S. Ct. 1204, 157 L. Ed. 2d 1122 (2004).*

Defendants argue that the Information-Gathering claim related to the OIG investigation must be dismissed because Defendants did, in fact, gather information from Plaintiff during this information, albeit after some delay. Defs.' Mot. at 9. Defendants contend that the Privacy Act allows an agency to approach a target at the end of an investigation, if at all, when circumstances render a different approach impracticable. In the context of the investigation of a theft, where [*42] the subject's credibility is in question, the delay in consulting with Plaintiff is entirely reasonable. Because the Second Amended Complaint fails to allege that it was practical to approach Plaintiff earlier in the investigation, Defendants argue, Count I must be dismissed as to the OIG Information-Gathering claim.

Plaintiff responds that an earlier attempt to obtain information from him would have resulted in an earlier favorable resolution of this investigation. He further contends that there is no basis to believe he attempted to influence witnesses or interfere with the OIG investigation, and that Defendants' arguments regarding this issue are factual speculations that are inappropriate in a motion to dismiss. Pl.'s Opp'n at 5-6.

Defendants' own arguments underscore the disputed factual nature of this issue. Each of the cases Defendants cite in support of their argument arose in a post-discovery summary judgment or final judgment posture. For example, in *Carton v. Reno, 310 F.3d 108, 111-12 (2d Cir. 2002)*(internal citation omitted)(emphasis added), the Second Circuit pointed out that the "*specific nature of each case* shapes the practical considerations [*43] at stake that determine whether an agency has fulfilled its obligation." Whether the delay in this case was "reasonable," and whether Defendants actually gathered information from Plaintiff "to the greatest extent practicable" is, in this case, a disputed factual issue that cannot be decided at this early stage in the proceedings.

Defendants raise similar arguments regarding Plaintiff's claim that they failed to properly gather information from him during the CI investigation. Defs.' Mot. at 10-13. First, Defendants argue that Plaintiff has failed to allege that during this investigation Defendants could have gathered more information from him than they did. *Id.* at 10. Plaintiff responds that he "has *never* been interviewed as part of the CI investigation. Thus, Defendants have gathered *no* information from [Plaintiff], despite the fact that he could provide the very type of objective information to resolve this issue...." Pl.'s Opp'n at 7 (emphasis in original). Defendants concede that the CIA failed to speak directly with Plaintiff during the CI investigation. *See* Defs.' Mot. at 13; Defs.' Reply at 6. When considered with Plaintiff's allegation that Defendants "failed [*44] to the greatest extent practicable to collect [information] directly from Plaintiff," this is sufficient to put Defendants on notice as to the nature of Plaintiff's Information-Gathering claim.

Second, Defendants argue that they could not, in fact, have practicably gathered information directly from Plaintiff during the CI investigation. The failure to consult with Plaintiff regarding this investigation is excusable, Defendants contend, because there is no absolute requirement that an agency gather information from the subject of an investigation where the subject is in a position to intimidate third parties or encourage collusion. Given Plaintiff's position as a CIA officer, he had considerable power over the "asset" with whom he allegedly had a sexual relationship. Defendants further emphasize the importance of protecting CIA sources and methods, and the agency's concern that a requirement to speak at an early point in the investigation with its target could compromise those sources or methods.

While Defendants' arguments are not without their appeal, they suffer from the same flaws as the arguments relating to the OIG investigation. Whether Plaintiff was in a position to coerce [*45] the "asset" in question, and whether this was a concern that motivated investigators to avoid gathering information from him, are questions of fact not appropriate for resolution at this stage.

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Privacy Act claim is denied.

## C. Plaintiff's Failure to Convert Claim (Count IV) Is Dismissed Because It Has No Legal Basis

Count IV purports to state a claim for Defendants' "failure to convert" his status from contract employee to staff employee. Defendants argue that contract employees have no right to such status conversion, and that Plaintiff's subjective and mistaken belief that he was promoted does not create any legal entitlement to the promotion. Defs.' Mot. at 33-34. Moreover, Defendants argue that the claim is precluded because the United States has not waived sovereign immunity. *Id.* at 34. In his Opposition, Plaintiff invokes both contract and fraud principles in a confusing response to Defendants' arguments. Pl.'s Opp'n at 28-29.

There is no legal basis for a claim of "failure to convert." To the extent this claim is part of Plaintiff's contract or FTCA claims, as Plaintiff appears to argue, it is [*46] subsumed within those counts and must be dismissed for lack of jurisdiction.

To the extent this claim purports to allege a separate breach of contract for failure to abide by an alleged agreement to convert Plaintiff to an agency employee, it

must fail on two grounds. [20] First, such a contract claim amounts to yet another attempt to seek judicial review of an adverse personnel action and is preempted by the CSRA. *See Bobula v. United States Department of Justice, 970 F.2d 854 at 857*. Second, federal employment is governed by federal personnel law and not common law contract principles. Accordingly, federal employees' employment relationships are governed by Congressional statute and federal case law, not common law contract law. *OCONUS DOD Emple. Rotation Action Group v. Cohen, 144 F. Supp. 2d 1, 8 (D.D.C. 2000)* (*citing Bell v. United States, 366 U.S. 393, 401, 81 S. Ct. 1230, 6 L. Ed. 2d 365 (1961)*; *Kizas v. Webster, 227 U.S. App. D.C. 327, 707 F.2d 524, 535 (D.C. Cir. 1983)*; *Kania v. United States, 227 Ct. Cl. 458, 650 F.2d 264, 268 (Ct. Cl. 1981)*).

> 20    In his Opposition, Plaintiff contends for the first time that he relied upon Defendants' representations to him that he had been converted to a staff employee. Pl.'s Opp'n at 28. This allegation is nowhere contained in Plaintiff's Second Amended Complaint. To the extent that Plaintiff is attempting to raise a promissory estoppel claim, he cannot do so for the first time in his Opposition to Defendants' Motion to Dismiss.

[*47] Plaintiff's argument that he "has a colorable claim for ... misrepresentation," Pl.'s Opp'n at 28, is similarly unavailing. *Federal Rule of Civil Procedure 9(b)* requires a plaintiff to plead misrepresentation with particularity, including (1) the time, place, and contents of alleged misrepresentations; (2) the identity of the person

who made the misrepresentation; and (3) the method by which the misrepresentation was made to the plaintiff. See *United States ex rel. Totten v. Bombardier Corp., 351 U.S. App. D.C. 30, 286 F.3d 542, 551-52 (D.C.Cir.2002)*. Plaintiff's Second Amended Complaint contains no such specificity. In his "failure to convert" claim, Plaintiff alleges that "Defendants apparently failed to convert Plaintiff to the status of a staff employee to which Plaintiff was entitled." 2AC P 53. This allegation contains none of the particularities required to plead misrepresentation under *Rule 9(b)*. Moreover, as Defendants point out in the context of the FTCA claim, misrepresentation suits are exempt from the FTCA's waiver of sovereign immunity under the "intentional tort" exception. Defs.' Mot. at 29; *see 28 U.S.C. § 2680(h)* [*48] .

For these reasons, Plaintiffs "failure to convert" claim is dismissed.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

The following counts remain in this case: Count II (Privacy Act claim) and Count V (Bivens claim).

An Order will issue with this Memorandum Opinion.

January 12, 2007

/s/ Gladys Kessler

United States District Judge